010-15

No. 01-13-00038-CR

RECEIVED IN
COURT OF CRIMINAL APPEALS

MAR 06 2015

Abel Acosta, Clerk

IN THE COURT OF CRIMINAL
APPEALS OF TEXAS

TRAVIS WADE COLEMAN JR, Appellant

VS

THE STATE OF TEXAS, Appellee

From the Criminal District Court 412 of Brazoria County, Texas, Cause No. 66105, the Honorable W. Edwin Denman, Presiding and the Fourteenth District Court of Appeals in Houston, Texas, Cause No. 01-13-00038-CR

PETITION FOR DISCRETIONARY REVIEW

FILED IN
COURT OF CRIMINAL APPEALS

MAR 06 2015

Abel Acosta, Clerk

Travis Wade Coleman Jr.
Appellant, pro-se
899 FM 632
Kenedy, Texas 78119

# TABLE OF CONTENTS

Pages:

TABLE OF CONTENTS ............................................... i

LIST OF PARTIES ............................................... ii

INDEX OF AUTHORITIES ............................................... iii

STATEMENT OF PROCEDURAL HISTORY ............................................... iv

STATEMENT OF THE CASE ............................................... 1

ARGUMENT AND AUTHORITIES ............................................... 2

GROUND(S) FOR REVIEW ............................................... 2

GROUND FOR REVIEW NUMBER ONE:

BECAUSE IT WAS SPECIFICALLY RAISED AND ARGUED, SHOULD THE COURT OF APPEALS HAVE FOLLOWED THE APPROACH SET OUT IN THE WILLIAMSON PLURALITY, INSTEAD OF DECIDING THE CASE BASED UPON WALTER? ............... 2

REASON(S) FOR REVIEW:

The Court of Appeals has decided an important question of federal or state law that is in conflict with applicable decision(s) of the United States Supreme Court; in particular Williamson v. United States, 512 U.S. 594, 114 S.Ct. 2431, 129 L.Ed. 2d 476 (1994)......

PRAYER ............................................... 3

CERTIFICATE OF SERVICE ............................................... 4

APPENDIX:

        (A) OPINION FROM THE COURT OF APPEALS

        (B) MANDATE FROM THE COURT OF CRIMINAL APPEALS ...... APPENDIX

# LIST OF PARTIES

The following is a list of all the names and addresses of the parties to the trial court's final judgment and their counsel in the trial court:

1. Appellant:

Travis Wade Coleman Jr

TDCJ-ID #

899 FM 632

Kenedy, Texas 78119

2. Appellant's ~~Trial~~ Appellate Counsel:

Perry Stevens

State Bar No. 00797494

Attorney at Law

608 East Mulberry

Angleton, Texas 77515

(979) 848-1111

3. Attorney for the Appellant at Trial:

Mark Robert Davis

State Bar No. 05525500

Attorney at Law

P.O. Box 741

Lake Jackson, Texas 77566

(979) 297-8860

Appellee:

The State of Texas

## ATTACHMENT OF COURT OF APPEALS OPINION

A copy of the Opinion from the Court of Appeals is attached in the Appendix of this Petition

A copy of the Court of Criminal Appeals Mandate is attached in the Appendix of this Petition.

### STATE CASES

Walter v. State, 267 S.W.3d 883 (Tex Cr. App. 2008) . . . . . . . .

### STATUTES

Texas R. Evid. 802 . . . . . . . . . . . . . . . . . . . . . .

### FEDERAL CASES

Williamson v. United States, 512 U.S. 594, 114 S.Ct. 2431, 129 L.Ed.2d 476 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### CONSTITUTIONAL PROVISIONS

6th Amend. U.S. CONST . . . . . . . . . . . . . . . . . . . . .

## STATEMENT OF PROCEDURAL HISTORY

Appellant was indicted on October 6, 2011 for Murder in cause number 66,103. On August 28, 2012 a jury was impaneled and on August 29, 2012 Appellant plead not guilty. On September 7, 2012, the jury found Appellant guilty and assessed punishment at thirty-three years in the Texas Department of Criminal Justice. Appellant filed a Motion for New Trial and Notice of Appeal on September 7, 2012. On September 12, 2012 the trial Court appointed appellate counsel.

On May 22, 2013 appellant appealed to the Fourteenth District Court of Appeals in Houston.

On January 23, 2014 the First District Court of Appeals rendered its decision affirming Appellant's judgment of conviction.

On August 22, 2014 the Appellant filed a Writ of Habeas Corpus requesting an out-of-time P.D.R. (Petition For Discretionary Review).

On December 22, 2014 the Court of Criminal Appeals granted the request for out-of-time P.D.R.

On January 12, 2015 The Court of Criminal Appeals granted the Appellant's Pro-Se Motion for an extention of time in which to file the Petition for Discretionary Review. The time to file the petition has been extended to March 28, 2015.

Appellant now files this Petition for Discretionary Review with the Clerk of the Court of Criminal Appeals in compliance with the Tex. R. App. Proc.

IV

IN THE COURT OF CRIMINAL
APPEALS OF TEXAS
SITTING AT AUSTIN

_____

TRAVIS WADE COLEMAN, JR, Appellant

VS.

THE STATE OF TEXAS, Appellee

_____

## PETITION FOR DISCRETIONARY REVIEW

TO THE HONORABLE JUDGES OF THE COURT OF CRIMINAL APPEALS:

COMES NOW, TRAVIS WADE COLEMAN JR., Appellant, pro se and respectfully submits this Petition for Discretionary Review requesting review of the judgment of the Court of Appeals.

## STATEMENT OF THE CASE

The Appellant, Travis Wade Coleman, Jr, was convicted of Murder by a jury in the 412TH District Court for Brazoria County, Texas, Hon. Ed Denman presiding. The Appellant was sentenced to 33 years imprisonment. Appellant seeks review of the Court of Appeals' judgment affirming his conviction. Specifically, the Court of Appeals did not follow the approach set out in the Williamson's case, concerning hearsay statements of his co-defendant through the testimony of three third-party witnesses.

1

## GROUND(S) AND REASON FOR REVIEW

GROUND FOR REVIEW NUMBER ONE (Restated):

BECAUSE IT WAS SPECIFICALLY RAISED AND ARGUED, SHOULD THE COURT OF APPEALS HAVE FOLLOWED THE APPROACH SET OUT IN THE WILLIAMSON PLURALITY, INSTEAD OF DECIDING THE CASE BASED UPON WALTER?

## REASON(S) FOR REVIEW

The Court of Appeals has decided an important question of state or federal law in a way that conflicts with the applicable decision(s) of the Supreme Court of the United States, in particular Williamson v. United States, 512 U.S. 594, 114 S.Ct. 2431 (1994).

## ARGUMENT AND AUTHORITIES

The Court of Appeals overruled a point of error asserting the trial court erroneously admitted hearsay statements of his co-defendant through the testimony of three third party witnesses.

The Appellant argued that the facts within his trial supported a limited use of third party hearsay as written by Justice O'Connor and supported by the majority court only if it is shown the declarant is unavailable. (App. Br. at pp 7-8) See also Williamson v. United States, 512 U.S. 594, 114 S.Ct 2431 (1994).

The Appellant asserted that the Key difference between the Walter and the Williamson cases were the issue of the declarants availability. The Fed.R. Evid 804 (b)(3) requires a showing that the declarant is unavailable where as the Tex.R.Evid. 803(24) does not require the declarant to be unavailable.

2

The Court of Appeals opinion did not address the question of availability neither did the trial court.

The Appellant's co-defendant was in fact available at trial and the Appellant request this Court to take Judicial Notice of the trial record.

The Court of Appeals opinion was decided based upon the Court of Criminal Appeals ruling in Walter v. State, 267 S.W.3d 883 (Tex. Crim. App 2008), as binding authority. The Walter opinion provides less protection then what the United States Court has held to be required [before] third party testimony can be introduced.

Indeed the Walter's opinion conflicts with the Williamson's controlling authority.

The failure to provide the protection against hearsay as proscribed by the Williamson opinion denies Appellant his right to a fair trial under the 6th Amendment of the United States Constitution, denies him his right to confrontation, and provides less protection then that required by the Williamson Court.

This Court should grant review to provide guidence to the First District Court of Appeals and other Courts of Appeals that before third party hearsay testimony can be introduced the declarant must be shown to be unavailable.

## PRAYER FOR RELIEF

WHEREFORE, PREMISES CONSIDERED, Appellant prays that the Court grant this Petition for Discretionary Review upon submission, reverse the judgment of the Court of Appeals

Respectfully Submitted,

X Travis W Coleman Jr

## CERTIFICATE OF SERVICE

The above signature certifies that on Febuary ____, 2015, a true and correct copy of the foregoing Petition has been mailed to the State Prosecuting Attorney, P.O. Box 12405, Austin, Texas 78711.

4.

# APPENDIX

Opinion issued January 23, 2014



In The

## Court of Appeals

For The

## First District of Texas

---

NO. 01-13-00038-CR

---

TRAVIS WADE COLEMAN, JR., Appellant

V.

THE STATE OF TEXAS, Appellee

---

On Appeal from the 23rd District Court
Brazoria County, Texas
Trial Court Case No. 66103

---

## OPINION

A jury convicted appellant, Travis Wade Coleman, Jr., of the offense of

murder and assessed punishment at thirty-three years' confinement.[1] In his sole

---

[1] See TEX. PENAL CODE ANN. § 19.02(b)(1)–(2) (Vernon 2011).

issue on appeal, appellant contends that the trial court erroneously admitted hearsay statements of his co-defendant through the testimony of three third-party witnesses.

We affirm.

## Background

On January 18, 2011, Brazoria County Sheriff's Office Investigator D. Collins was dispatched to investigate a deadly conduct report that appellant had called in outside of his family's residence in Alvin. Appellant lived at this address with his mother, Amy Coleman, one of his younger brothers, Aaron Coleman, an unrelated man, Jimmy Smith, and Amy's husband and appellant's stepfather, Ray Sambrano, the complainant. Investigator Collins spoke with appellant, who completed and signed a written statement. In this statement, appellant related that, while he was taking his dogs outside, a "32-v North Star Cadillac" pulled up with three men inside. The driver asked appellant if Sambrano was at home. After appellant responded that Sambrano was not, the driver told appellant to tell Sambrano that if the men see him, they're "going to kill him." The man sitting in the back seat of the car pulled out a shotgun and fired it into the air before the men drove off. Appellant gave a rough description of the men and the car, and he later met with a sketch artist. Investigator Collins was never able to locate either the car

2

or the men who allegedly threatened Sambrano, and, when he asked appellant's neighbors about this incident, no one told him that they had heard a shotgun blast.

The next day, January 19, 2011, appellant called the Brazoria County Sheriff's Office around 4:15 p.m. and reported that a shooting had occurred at his residence. When Investigator Collins arrived around 5:00 p.m., appellant, his younger brother, Jared Coleman, and his grandmother, Maybelle Martinez, were present at the residence. The responding officers led Investigator Collins to the master bedroom, where he saw Sambrano lying across the bed with his feet hanging off the left side of the bed. Sambrano had a shotgun wound to his face, which was immediately apparent, as well as a shotgun wound to the left side of his chest, which became apparent only when officers moved the surrounding blankets. Investigator Collins testified that the officers on the scene did not mention the second gunshot wound to anyone not investigating the murder. There were no signs of a struggle in the bedroom, and no guns were present in the room. Officers later determined that the gunshot wounds were caused by a 20-gauge shotgun.

Dr. Nobby Mambo, a medical examiner for Galveston County, testified that he performed the autopsy on Sambrano. Dr. Mambo testified that the level of rigor mortis and lividity present in the body indicated a time of death approximately eight to ten hours before Investigator Collins viewed and documented the state of the body at 5:00 p.m. on January 19, 2011.

3

Investigator Collins spoke with appellant immediately after the discovery of Sambrano's body. Appellant indicated that Sambrano was alive at some point during the morning, because appellant spoke with him and asked to use his shower. Appellant told Investigator Collins that he rode his bicycle to Martinez's house, where Jared was living, around 10:00 a.m. and remained there until 3:00 p.m., when he needed to leave for a 3:30 appointment. After this appointment, appellant, Jared, and Martinez returned to appellant's residence, where appellant and Jared found Sambrano dead.

Appellant spoke with Investigator Collins again on January 20, 2011, after first meeting with the sketch artist to complete sketches of the men involved in the alleged deadly conduct incident. Investigator Collins asked appellant to recount his activities on January 18, 2011, but appellant did not mention anything about the deadly conduct incident. Investigator Collins found that omission to be strange, but he still considered the individuals who had allegedly driven by the residence and threatened Sambrano to be the main suspects in the murder, not appellant. Investigator Collins interviewed appellant again a week later, and as a result of several inconsistencies throughout appellant's different statements, Collins considered him to be a suspect. Appellant acknowledged in this interview that he hated Sambrano. Investigator Collins did not arrest appellant at the time of the second interview.

4

In September 2011, Jared Coleman went to live briefly with the family of his friend Corey Kerchner. While there, he confessed to Kerchner's mother, Alice Yeargan, that he and appellant shot Sambrano. Yeargan took Jared to talk to the police the next day.

Also in September 2011, Investigator Collins contacted Russell Coleman, appellant's uncle, who lived in the same neighborhood. Russell owned, among other guns, a 20-gauge shotgun, which he surrendered to the police. Russell also turned over another gun, a deer rifle, which he had unexpectedly found in a green gun case that he usually used to store the shotgun. The trial court admitted both of these guns and the gun case into evidence.

Russell Coleman testified and identified State's Exhibit 15 as his shotgun. He testified that he usually kept that shotgun in a green case in his closet and that appellant knew where he stored that gun. Sometime in 2011, after Sambrano's murder, Russell tried to retrieve his shotgun from the case, but he instead discovered a deer rifle in its place. Russell did not expect to see that rifle, and he called his brother, appellant's father, to ask if his sons had taken the shotgun. Russell believed that appellant might have taken it because he had at one time asked Russell if he could borrow it to go hunting, and Russell told him that he could not borrow it. Several days after Russell called his brother, his brother

5

brought the shotgun back to him. Russell later gave the shotgun and the shotgun case, with the rifle inside of it, to the police.

Appellant's father, Travis Coleman Sr., testified that he had a conversation with Russell about his missing shotgun. Approximately one month after the murder, and after he had spoken to Russell, Travis drove appellant and appellant's older brother, Brandon, over to appellant's residence. Appellant went to the backyard for several minutes and then returned with "the shotgun in his boot, in his pants." Appellant got back in the car and said, "[H]ere is Uncle Russell's gun." Travis identified State's Exhibit 15 as the shotgun he saw down appellant's pants leg and as Russell's shotgun.

Investigator Collins also testified that after appellant was indicted, appellant had a conversation with his mother while he was in jail, and this conversation was recorded. During this conversation, appellant told his mother that he would run to Mexico, and he also said that "Jared needs to keep his mouth shut or he'll be putting us in prison." Investigator Collins also viewed a recorded conversation between appellant and his older brother's girlfriend, in which appellant stated that the only evidence the police had was Jared.

Dylan Woolridge, a friend of Jared's and appellant's, testified that he was around appellant when he was served with a copy of the indictment in this case. He testified that appellant was upset and crying and that he punched a wall or a

6

phone. Woolridge also testified that appellant told him that he did not want Jared "to go down for something for it" and that appellant was the one who killed Sambrano. Appellant told Woolridge that he took a shower and then shot Sambrano while he was asleep. Appellant also told him that he shot Sambrano with either a shotgun or a rifle and that appellant obtained the gun from "Russell or something like that," who was an uncle or "[s]omebody in [appellant's] family." Woolridge also testified that appellant told him that when he took the shotgun from his uncle, he switched the gun with a "243" rifle. Appellant told Woolridge that he stole the shotgun from his uncle and that he hid the shotgun under Sambrano's house after the murder.

Dakota Graham testified that he was friends with both Jared and appellant and that appellant had lived with him for awhile. Graham stated that, after the murder, he heard appellant make comments on several different occasions that he "was going to kill somebody like he did [Sambrano]." Graham testified that appellant "seemed kind of serious" when he would make those comments and that "there was no hesitation" when he would do so. He also testified that appellant told him that appellant "made a mistake" in his interview with the police because he forgot to mention the deadly conduct incident that had allegedly occurred the day before the murder and "the cops would think he was lying." Graham also testified that he had owned a "243" deer rifle that went missing a few months after

7

appellant moved out. He identified State's Exhibit 17, one of the guns recovered from Russell Coleman, as that rifle.

Jennifer Fitts, the former girlfriend of appellant's older brother, testified that she saw appellant on the night of Sambrano's murder and that his demeanor was "normal." She testified that appellant and his brothers hated Sambrano and that she had heard appellant say, before the murder, that he wished Sambrano was dead and that he would like to kill Sambrano.

The State also offered the testimony of three witnesses to whom Jared Coleman had spoken about his and appellant's involvement in Sambrano's murder. Defense counsel objected to the testimony of all three witnesses on hearsay grounds, and the trial court admitted the testimony under the "statement against interest" exception to the hearsay rule.

Leah Larivee testified that she started dating Jared in January 2011 and that, in February 2011, she moved into the same house as Jared. A few weeks after she moved in, she had a conversation with Jared about Sambrano's murder, and, during this conversation, "he just basically blurted out that he had killed his mom's boyfriend." Jared made this admission "completely out of the blue." Approximately one week later, after Jared had smiled at Larivee while they listened to a song called "Getting Away with Murder," she decided to ask him if he was serious or if he had been joking around with regard to his previous admission.

8

Jared replied that he was serious and "he proceeded to then tell [Larivee] how he actually did it." Jared told her that he and appellant formed a plan to kill Sambrano. He told her that he "was dropped off really early about a mile away from, I guess, [Sambrano's] residence and that he walked the rest of the way there." He told her that he waited for appellant for about an hour, that he turned on Sambrano's shower, that Sambrano woke up and asked him what he was doing, and that he and appellant both shot Sambrano—one in the side and one in the head. He then said that they got rid of the guns, and he went back to his grandparents' house where he was living at the time.

Corey Kerchner testified that he knew both Jared and appellant and that Jared briefly lived with his family beginning in September 2011. He testified that appellant had told him that he hated Sambrano. He also testified that, after Jared moved in with his family, he had a conversation with Jared about Sambrano's murder. Jared told Kerchner that he and appellant planned Sambrano's murder and that "they were doing God's work." Kerchner interpreted that to mean "taking people's lives, or taking the person's life like God would." The following exchange then occurred between the State and Kerchner:

| [The State]: | Did [Jared] ever tell you whether or not he participated in [the murder]? |
| [Kerchner]: | He told me that he was on the porch but— |
| [The State]: | Okay. That's good. |

9

The State then immediately passed the witness.

Finally, the State called Alice Yeargan, Kerchner's mother. She characterized her relationship with Jared as "close" and "like one of [her] kids," and she testified that Jared had previously confided in her. She testified that she had a conversation with Jared about Sambrano's murder in September 2011. Jared was upset and crying, and he told Yeargan that he and appellant shot Sambrano. He also told her that if he or appellant ever got caught, they would "probably kill themselves because they didn't want to hurt their mom that way." Yeargan took Jared to talk to the police the next day.

On cross-examination, Yeargan agreed with defense counsel that, at the time of her conversation with Jared, she knew that he was going to speak to the police the next day. On re-direct examination, she clarified that she had no indication that Jared was involved in Sambrano's murder before he admitted as much to her and that she had not been planning on taking him to the police before their conversation.

The jury convicted appellant of the offense of murder and assessed punishment at thirty-three years' confinement. This appeal followed.

## Admission of Hearsay Testimony

In his sole issue, appellant contends that the trial court erroneously admitted hearsay statements of Jared Coleman through the testimony of Leah Larivee, Corey Kerchner, and Alice Yeargan.

### A. Standard of Review

We review a trial court's decision to admit or exclude evidence for an abuse of discretion. *Torres v. State*, 71 S.W.3d 758, 760 (Tex. Crim. App. 2002) (citing *Burden v. State*, 55 S.W.3d 608, 615 (Tex. Crim. App. 2001)). We will not reverse the trial court's ruling unless it falls outside the zone of reasonable disagreement. *Id.* In applying the abuse of discretion standard, we may not reverse a trial court's admissibility decision solely because we disagree with it. *Powell v. State*, 63 S.W.3d 435, 438 (Tex. Crim. App. 2001). We will not disturb a trial court's evidentiary ruling if it is correct on any theory of law applicable to that ruling. *De La Paz v. State*, 279 S.W.3d 336, 344 (Tex. Crim. App. 2009).

### B. Admissibility of Inculpatory Statements by Co-Defendant

Generally, the hearsay rule excludes any out-of-court statements offered by a party at trial to prove the truth of the matter asserted in the statement. *See* TEX. R. EVID. 801(d) (defining hearsay); TEX. R. EVID. 802 ("Hearsay is not admissible except as provided by statute or these rules or by other rules prescribed pursuant to statutory authority."); *Walter v. State*, 267 S.W.3d 883, 889 (Tex. Crim. App.

11

2008). One of the exceptions to the hearsay rule allows the admission of statements made against the declarant's interest. TEX. R. EVID. 803(24). This exception permits admission of:

> A statement which was at the time of its making . . . so far tended to subject the declarant to civil or criminal liability . . . that a reasonable person in declarant's position would not have made the statement unless believing it to be true. In criminal cases, a statement tending to expose the declarant to criminal liability is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.

*Id.* The rationale behind admitting these types of statements "stems from the commonsense notion that people ordinarily do not say things that are damaging to themselves unless they believe they are true." *Walter*, 267 S.W.3d at 890. "[A] reasonable person would not normally claim that he committed a crime, unless it were true." *Id.*

Rule 803(24) sets out a two-step foundation requirement for admissibility of hearsay statements. *Id.*; *Mason v. State*, — S.W.3d —, No. 14-12-00054-CR, 2013 WL 5861492, at *8 (Tex. App.—Houston [14th Dist.] Oct. 31, 2013, no pet. h.). The trial court must first determine whether the statement, considering all of the circumstances, subjects the declarant to criminal liability and whether the declarant realized this when he made the statement. *Walter*, 267 S.W.3d at 890–91. The trial court must then determine whether sufficient corroborating circumstances exist that clearly indicate the trustworthiness of the statement. *Id.* at 891. Both

12

statements that are directly against the declarant's interest and collateral "blame-sharing" statements that implicate both the declarant and the defendant may be admissible under Rule 803(24) if corroborating circumstances clearly indicate their trustworthiness.[2]  *Id.* at 896.  "Blame-shifting" statements that implicate the defendant but minimize the declarant's culpability are not admissible under this rule, absent extraordinary circumstances.  *Id.*; *see also Guidry v. State*, 9 S.W.3d 133, 149 (Tex. Crim. App. 1999) (holding statements inadmissible under Rule 803(24) because statements were "not so equally against both [the declarant's] and [the defendant's] interests as [to] reach this level of reliability").  The trial court is therefore "obligated to parse a generally self-inculpatory narrative and weed out those specific factual statements that are self-exculpatory or shift blame to another."  *Walter*, 267 S.W.3d at 897.

The determination of whether corroborating circumstances clearly indicate trustworthiness lies within the trial court's sound discretion.  *Mason*, 2013 WL

---

[2]  In *Walter v. State*, the Court of Criminal Appeals explicitly adopted this approach favored by Justice Kennedy in his concurring opinion in *Williamson v. United States*, 512 U.S. 594, 114 S. Ct. 2431 (1994), as opposed to the approach adopted by the plurality opinion in *Williamson*, which would admit statements solely against the declarant's interest but not collateral "blame-sharing" statements. *See* 267 S.W.3d 883, 896–97 (Tex. Crim. App. 2008) (discussing why Justice Kennedy's approach "represents better evidentiary policy").  Appellant argues that we ought to follow the *Williamson* plurality opinion, which construed the federal counterpart to Rule 803(24), instead of the Court of Criminal Appeals' decision in *Walter*.  Because the Court of Criminal Appeals in *Walter* construed and analyzed the precise rule at issue in this case, and its analysis is binding upon us, we decline to apply the approach set out in the *Williamson* plurality, and we instead decide this case based upon *Walter*.

13

5861492, at *8 (citing *Cunningham v. State*, 877 S.W.2d 310, 313 (Tex. Crim. App. 1994)). Several factors are relevant when analyzing the sufficiency of corroborating circumstances: (1) whether the guilt of the declarant is inconsistent with the guilt of the defendant; (2) whether the declarant was so situated that he might have committed the crime; (3) the timing of the declaration; (4) the spontaneity of the declaration; (5) the relationship between the declarant and the party to whom the statement was made; and (6) the existence of independent corroborative facts. *Woods v. State*, 152 S.W.3d 105, 113 (Tex. Crim. App. 2004); *Dewberry v. State*, 4 S.W.3d 735, 751 (Tex. Crim. App. 1999); *Mason*, 2013 WL 5861492, at *8. The first two factors only apply when the defendant is the proponent of a statement that tends to exculpate the defendant. *Woods*, 152 S.W.3d at 113. The first two factors are not relevant when, as here, the statements are offered by the State to inculpate the defendant. *Id.* The trial court may consider evidence undermining the reliability of the statement as well as evidence corroborating its trustworthiness. *Mason*, 2013 WL 5861492, at *8 (citing *Cunningham*, 877 S.W.2d at 312).

We must first address whether the challenged hearsay statements subject the declarant, Jared Coleman, to criminal liability and whether he recognized that at the time of the statements. *See Walter*, 267 S.W.3d at 890–91. Here, the State offered the testimony of three witnesses, Leah Larivee, Corey Kerchner, and Alice

14

Yeargan, all of whom testified that Jared Coleman had made statements to them concerning his and appellant's participation in Sambrano's murder.

### 1. Leah Larivee

Larivee testified that she started dating Jared in January 2011 and that she moved into a house in which Jared was living in February 2011. A few weeks after she had moved in, she had a conversation with Jared in which he "just basically blurted out that he had killed his mom's boyfriend." Larivee testified that this statement was "completely out of the blue." About a week later, Larivee asked Jared if he was serious about having killed his mother's boyfriend. Jared "told [her] that he was [serious], that he wasn't joking, and then he proceeded to then tell [her] how he actually did it." Jared then told her that he and appellant had formed a plan to kill Sambrano,[3] that, on the day of the murder, he was "dropped off really early about a mile away from" Sambrano's residence, that he walked to the residence, that he waited for appellant, and that both of them shot Sambrano—one in the side and one in the head. Jared then told Larivee that he and appellant got

---

[3] On appeal, appellant argues that Larivee testified that Jared told her that appellant was responsible for forming the plan to kill Sambrano, which is thus a "blame shifting" statement and is inadmissible under *Walter*. Larivee clearly testified that Jared told her that both he and appellant formed the plan to kill Sambrano, but even if he had said that appellant alone formed the plan, the ultimate question is whether Jared implicated both himself and appellant in Sambrano's murder, which he did when he told her that both he and appellant shot Sambrano. Jared did not make any "blame shifting" statements to Larivee that minimized his role in killing Sambrano.

15

rid of their clothes and the guns before going back to their grandparents' house, where he had been staying.

All of Jared's statements to Larivee subject him to criminal liability for Sambrano's murder, and the statements implicate both himself and appellant equally in Sambrano's murder. *See Walter*, 267 S.W.3d at 899 ("[O]ut-of-court statements from a co-defendant that are against the declarant's penal interest but also inculpate the defendant are viewed with some suspicion. That suspicion is lessened when the speaker makes no distinction between his conduct and that of the defendant—where there is absolute equality."). Moreover, the trial court could have reasonably concluded that Jared recognized at the time he spoke with Larivee that his statement that he had participated in Sambrano's murder by shooting him was against his penal interest. *See id.* at 891 n.26 (quoting 4 CHRISTOPHER B. MUELLER & LAIRD C. KIRKPATRICK, FEDERAL EVIDENCE § 496 at 813–15 (2d ed. 1994) ("[T]he required understanding of interest is framed in objective terms: Would a reasonable person have understood that what he said was against his interest? The aim is to know how the speaker conceived his interests, but, absent better evidence, the court may attribute to him the interests a reasonable person in his situation would have.")). A reasonable person would have understood that admitting to killing another person was against his interest.

16

We now must determine whether sufficient corroborating circumstances clearly indicate the trustworthiness of Jared's statements to Larivee. Jared made these statements to Larivee within a few weeks of Sambrano's murder, and he made the first statement to Larivee, in which he implicated just himself in the murder, completely spontaneously. He made his other statements, in which he implicated himself and appellant, approximately a week later, after Larivee asked him if he was serious about his involvement in the offense. Jared and Larivee were dating at the time he made the statements. *See Woods*, 152 S.W.3d at 113 ("These were 'street corner' statements that Rhodes made to his friends without any motive to shift blame to another or minimize his own involvement in the murders."); *Dewberry*, 4 S.W.3d at 751–52 (considering, in holding that hearsay statements were admissible, that statements were either spontaneously made or made in response to casual inquiries from "friends and criminal acquaintances not connected to the commission of the offense"); *see also Walter*, 267 S.W.3d at 898 ("Statements to friends, loved ones, or family members normally do not raise the same trustworthiness concerns as those made to investigating officers because there the declarant has an obvious motive to minimize his own role in a crime and shift the blame to others.").

The State also presented independent corroborative facts that verified Jared's statements to Larivee. The medical examiner's testimony reflected that, based on

17

the presence of rigor mortis and lividity, Sambrano was likely killed in the morning. Jared told Larivee that he and appellant both shot Sambrano—one in the side and one in the face—and officers testified that, although they could immediately tell that Sambrano had been shot in the face, the gunshot wound to his side was not readily apparent, and it was instead only discoverable after the officers moved blankets. Investigator Collins testified that the officers kept the fact of the second shotgun wound to themselves in an effort to evaluate the credibility of any information about the murder that they received. Several witnesses testified that appellant and Jared hated Sambrano, and appellant himself admitted as much during one of his interviews with Investigator Collins.

Officers determined that Sambrano's wounds were caused by a 20-gauge shotgun. Russell Coleman, appellant's uncle, discovered after the murder that his 20-gauge shotgun, which he had forbidden appellant from using, went missing, and, after he informed his brother Travis, appellant's father, of this fact, Travis later returned the shotgun. Travis testified that he took appellant by the house where the murder occurred, and appellant disappeared and returned with a shotgun down his pants leg. Appellant then told Travis, "[H]ere's Uncle Russell's gun." Dakota Graham, a friend of both appellant's and Jared's, testified that he owned a deer rifle that went missing and was later discovered by Russell Coleman in place of his missing shotgun. Graham also testified that he heard appellant say, on

multiple occasions, that he would shoot someone in the face "like he did to [Sambrano]." Dylan Woolridge testified that appellant admitted his involvement in the murder to him after he received a copy of the indictment. Appellant related to Woolridge that he stole a shotgun from his uncle and switched it with a rifle. Appellant was concerned about Jared's getting in trouble, and he told Woolridge that he was the one who killed Sambrano. Investigator Collins also testified concerning a recorded jailhouse conversation between appellant and his mother, during which appellant stated that he "would run to Mexico" and that "Jared needs to keep his mouth shut or he'll be putting us in prison."

We conclude that the corroborating circumstances clearly indicate the trustworthiness of Jared's statements to Larivee. We hold that the trial court did not abuse its discretion when it admitted Larivee's testimony concerning the statements that Jared Coleman made to her.

### 2. Corey Kerchner

Kerchner testified that, several months after Sambrano's murder, Jared came to live with his family. He stated that he had a conversation with Jared concerning Sambrano's murder, and Jared told him that he and appellant planned the murder for about a year before it happened. Jared also told him that he and appellant "were doing God's work" when they killed Sambrano. Kerchner understood this statement to mean "taking people's lives, or taking the person's life like God

would." When the State asked Kerchner if Jared told him "whether or not [Jared] participated in [the murder]," Kerchner responded that Jared "told [Kerchner] that he was on the porch but—." The State cut Kerchner off and immediately passed the witness.

Jared's first two statements to Kerchner—that he and appellant planned the murder for a year and that they "were doing God's work"—equally implicate both himself and appellant in Sambrano's murder, and the trial court could have reasonably concluded that Jared was aware of the inculpatory nature of the statements at the time that he made them. These statements, like the ones to Larivee, were made spontaneously to a friend, albeit several months after the murder instead of several weeks after. As we have already discussed with regard to the statements made to Larivee, the State presented independent evidence corroborating Jared and appellant's involvement in Sambrano's murder. We conclude that corroborating circumstances clearly indicate the trustworthiness of these two statements to Kerchner and, thus, the trial court did not abuse its discretion in admitting Kerchner's testimony concerning these two statements.

However, Jared's third statement to Kerchner—that he was on the porch when the murder occurred—minimizes Jared's role in the murder and shifts blame for the murder from himself to appellant. *See Walter*, 267 S.W.3d at 899 ("[W]hen the declarant minimizes his culpability and shifts major blame to a cohort, the self-

20

serving aspect of the statement generally outweighs the self-inculpatory aspect."); *Guidry*, 9 S.W.3d at 149 ("While some of Prystash's statements refer to 'we,' meaning both himself and appellant, on the critical issue of who killed the victim, Prystash's statements inculpate appellant alone as the triggerman and describe with specificity how 'appellant' killed the victim."). We therefore conclude that the trial court erroneously admitted this "blame shifting" statement.

The erroneous admission of a hearsay statement constitutes non-constitutional error that is subject to a harm analysis. *Campos v. State*, 317 S.W.3d 768, 779 (Tex. App.—Houston [1st Dist.] 2010, pet. ref'd). We disregard non-constitutional errors that do not affect the substantial rights of the defendant. *See* TEX. R. APP. P. 44.2(b); *Johnson v. State*, 43 S.W.3d 1, 4 (Tex. Crim. App. 2001). A substantial right is affected when the error had a substantial or injurious effect in determining the verdict. *Campos*, 317 S.W.3d at 779. We do not overturn a conviction if, after examining the record as a whole, we have fair assurance that the error did not influence the verdict or had but a slight effect. *Id.*

Although both the State and appellant referred to Kerchner's testimony during closing argument, neither party addressed or emphasized Kerchner's specific testimony that Jared told him he was on the porch when the murder occurred. Instead, the State, in particular, merely reminded the jury that Jared had told Kerchner that he and appellant planned the murder. This particular statement,

21

which was not elaborated upon by the State during Kerchner's testimony, was the only statement made by Jared to another person in which he attempted to shift blame for the murder solely to appellant. Moreover, as we have already detailed, the State presented evidence corroborating appellant's and Jared's involvement in the murder. This statement was not the only evidence tying appellant to the murder. We thus have "fair assurance" that this statement did not influence the verdict in this case. *See id.* We therefore conclude that, when considering the totality of the evidence and all of the surrounding circumstances, the trial court's admission of Jared's statement to Kerchner that he was on the porch at the time of the murder, did not affect appellant's substantial rights.

We hold that admission of this statement was harmless error.

### 3. Alice Yeargan

Yeargan, Kerchner's mother, testified that Jared moved in with her family in September 2011. She characterized her relationship with Jared as "close," and she stated that he had confided in her on several occasions. She testified that she and Jared had a conversation about Sambrano's murder shortly after Jared moved in. Jared was upset and crying, and he told Yeargan that he and appellant shot Sambrano. Jared then told Yeargan that if he and appellant got caught, they would "probably kill themselves because they didn't want to hurt their mom that way." On cross-examination, Yeargan testified that, at the time she had this conversation

with Jared, she knew that he planned on talking to Investigator Collins the next day. She clarified on re-direct examination that she did not know that Jared was involved with Sambrano's murder before he admitted as much to her and that she had not been planning to take Jared to the police before this conversation.

Jared's statement to Yeargan that he and appellant shot Sambrano is a permissible "blame sharing" statement that inculpates both Jared and appellant equally. *See Walter*, 267 S.W.3d at 896. Additionally, as we have already held with respect to Jared's statements to Larivee and Kerchner, the trial court could have reasonably concluded that the statement subjected Jared to criminal liability and that Jared recognized as much at the time he made the statement.

Jared made this statement approximately eight months after the murder to a trusted family friend and maternal figure. Defense counsel elicited testimony from Yeargan that she took Jared to speak with Detective Collins the day after he made this statement to her, but there is no indication that his statement to Yeargan was anything other than a spontaneous admission of Jared's complicity in the offense. Yeargan testified that she did not know anything of his involvement in the offense before he made the admission and that Jared was upset and crying during their conversation. As we have already held, the State presented independent corroborative evidence of appellant's and Jared's involvement in the offense.

23

We therefore conclude that corroborating circumstances clearly indicate the trustworthiness of this statement and that the trial court did not abuse its discretion when it allowed Yeargan's testimony concerning the statement that Jared made to her.

We overrule appellant's sole issue.

## Conclusion

We affirm the judgment of the trial court.

Evelyn V. Keyes
Justice

Panel consists of Justices Keyes, Higley, and Massengale.

Publish. TEX. R. APP. P. 47.2(b).

24



# TEXAS COURT OF CRIMINAL APPEALS

## Austin, Texas

# M A N D A T E

### TRIAL COURT NO. 66103-A

### COURT OF APPEALS NO. 01-13-00038-CR

**THE STATE OF TEXAS,**

**TO THE 23RD DISTRICT COURT OF BRAZORIA COUNTY GREETINGS:**

Before our **COURT OF CRIMINAL APPEALS**, on **NOVEMBER 26, 2014**, the cause upon an Application for Writ of Habeas Corpus styled;

### EX PARTE TRAVIS WADE COLEMAN, JR.

CCRA NO. **WR-82,279-01**

was determined; and therein our said **COURT OF CRIMINAL APPEALS** made its order in these words:

"This cause came on to be heard on the Application for Writ of Habeas Corpus, and the same being considered, because it is the Opinion of this Court that the relief prayed for should be **GRANTED**, it is **ORDERED, ADJUDGED AND DECREED** that an **out-of-time Petition for Discretionary Review** is **GRANTED**, in accordance with the Opinion of this Court, and that this Decision be certified below for Observance."

**WHEREFORE,** We command you to observe the order of our said **COURT OF CRIMINAL APPEALS** in this behalf and in all things have it duly recognized, obeyed and executed.

WITNESS, **THE HONORABLE SHARON KELLER**, Presiding Judge

of our said **COURT OF CRIMINAL APPEALS,**

with the Seal thereof annexed, at the City of Austin,

on this day **Monday, December 22, 2014.**



ABEL ACOSTA, Clerk

COPY