Opinion issued February 11, 2020



In The

# Court of Appeals

For The

# First District of Texas

_____

## NO. 01-17-00945-CR

_____

**CHRISTIAN SHAWN WILLIAMS, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 434th District Court**
**Fort Bend County, Texas**
**Trial Court Case No. 15-DCR-070091B**

---

## OPINION ON REHEARING

Christian Shawn Williams was convicted of murder. On appeal, he raises three issues: (1) the evidence is legally insufficient to support his conviction; (2) the trial court erred in admitting expert testimony; and (3) the trial court erred

in admitting statements made by a codefendant to his cellmate. We affirm the trial court's judgment.[1]

## Background

On the evening of May 28, 2015, Stephanie Peña was shot and killed in a retail pharmacy parking lot while she sat in the driver's seat of her car. A witness in the parking lot heard a gunshot and saw a young African-American man run from a black car to a white car. The white car sped away, and the witness called 911.

Responding officers found a spent cartridge casing on the floorboard of Peña's car. They also found a small amount of marijuana and a beer can that was still cold to the touch. They recovered Peña's cell phone and extracted its contents to a separate drive. Cell phone data records showed that before her death, Peña was communicating with a phone number registered to Solitaire Williams, Christian Williams's mother. The number was the same number he had given to the Fort Bend County probation department as his own. The records associated with that phone number showed multiple communications with Peña, including more than 75 text messages and two calls, between the afternoon and evening of May 28, but

---

[1] We issued a memorandum opinion on August 1, 2019, in which we affirmed Williams's conviction, holding that the trial court did not err in admitting expert testimony or admitting statements made by a codefendant. We declined to reach sufficiency of the evidence because it was filed in a supplemental brief. Williams moved for rehearing. We deny the motion, withdraw our August 1, 2019 memorandum opinion and judgment of the same date, and issue this substitute opinion and judgment in their stead.

2

not after the time Peña died. Police tried to locate Williams's phone after the murder, but it was turned off throughout the entire investigation.

Investigators discovered other phone numbers associated with Williams by contacting his probation officer. They obtained a warrant to "ping," or connect with, a number associated with him, providing law enforcement with the phone's location every 15 minutes. The phone was located in an apartment complex in Houston. Simultaneously, detectives investigated another person, Robert Dike, based on leads they had gathered. Dike lived in the same apartment complex where Williams's phone pinged. After surveillance, officers obtained an arrest warrant for Williams and went to the apartment. When they arrived, Williams jumped from the third-floor balcony to the second-floor balcony and surrendered. Dike was in the apartment and was arrested on traffic warrants.

Detectives later obtained the actual text messages between Williams and Peña. The text messages demonstrated that Williams contacted Peña to purchase marijuana. The two negotiated a price for two ounces of marijuana and debated where to meet for the purchase. Eventually, they agreed on a location near the pharmacy parking lot. The last communication between them was a 90-second phone call, the details of which are unknown.

Williams was charged with capital murder. At trial, the jury heard testimony consistent with the above facts. Additionally, Peña's friend testified that he had

met up with Peña shortly before her death. He met her in the parking lot of a fast food restaurant and got into the passenger seat of her dark Lexus sedan. They met so that the friend could view and possibly purchase some marijuana. While they were in Peña's car, she received a phone call from a man. The friend believed that he heard the name "Christian" during the conversation.

Demond Walton testified that he was cellmates with Robert Dike, who eventually was also charged with the murder. While in the Fort Bend County jail, the two men became friends, and Dike told Walton why he was in jail. Dike said that he and Williams intended to rob a drug dealer for marijuana.

The jury found Williams guilty of the lesser-included offense of murder and sentenced him to 23 years' imprisonment.

**Analysis**

We address three issues on appeal: (1) the evidence was insufficient to support Williams' conviction; (2) the trial court erred in admitting testimony from a cell phone analyst because her methods were unreliable; (3) the trial court erred in admitting Walton's testimony because it was inadmissible hearsay and violated his right to confrontation. We affirm.

I.      **Sufficiency of the Evidence**

Williams claims that the evidence is insufficient to support his murder conviction.

4

## A. Standard of Review

When reviewing the legal sufficiency of the evidence to support a conviction, we consider all of the evidence in the light most favorable to the verdict to determine whether, based on that evidence and the reasonable inferences therefrom, the jury was rationally justified in finding guilt beyond a reasonable doubt. *Merritt v. State*, 368 S.W.3d 516, 525 (Tex. Crim. App. 2012) (citing *Jackson v. Virginia*, 443 U.S. 307, 318–19 (1979). We consider all evidence in the record, whether it was admissible or inadmissible. *Winfrey v. State*, 393 S.W.3d 763, 767 (Tex. Crim. App. 2013). The jury is the sole judge of credibility and weight to be given to the testimony of the witnesses. *Lancon v. State*, 253 S.W.3d 699, 707 (Tex. Crim. App. 2008). The jury may accept or reject all or any part of a witness's testimony. *Id.*

A person commits the offense of murder if he: (1) intentionally or knowingly causes the death of an individual; (2) intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual; or (3) commits or attempts to commit a felony, other than manslaughter, and in the course of and in furtherance of the commission or attempt, or in immediate flight from the commission or attempt, he commits or attempts to commit an act clearly dangerous to human life that causes the death of an individual. *See* TEX. PENAL CODE § 19.02(b).

**B.     Analysis**

The evidence was sufficient to support Williams's conviction. The record reflects that a witness in the retail pharmacy parking lot heard a gunshot that killed Peña and described seeing a man fitting Williams's general description running from a dark Lexus sedan where the victim was shot and getting into the back of a white car. The witness called 911. Peña's friend testified that he met up with her on the day she died to consider purchasing some marijuana. He testified that Peña brought the marijuana, they met in a fast food restaurant parking lot, and he got into the passenger side of her dark-colored Lexus sedan. While he was viewing the marijuana, Peña received a call from a man wanting to purchase the same marijuana. The friend believed he heard the name "Christian" in the conversation. The friend left without purchasing the marijuana Peña showed him.

Demond Walton, a man who was incarcerated with Williams's codefendant, testified that the codefendant told him that he and Williams planned to rob their victim of her drugs. The police did not discover any marijuana in Peña's car, corroborating the testimony that she had been robbed of her marijuana.

Peña's phone contained communications with a phone number that Williams had given to the Fort Bend County probation department as his number. The phone records showed that the two were communicating up until the time of Peña's death, but not after it. When police tried to ping the phone after the death, it was always

turned off. When the police arrived to arrest Williams at Dike's apartment complex, he jumped off a third-floor balcony in an attempt to escape, but he was caught.

Circumstantial evidence is as probative as direct evidence and can be sufficient to establish guilt. *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). The jury heard that Williams communicated with the victim numerous times until the time of her death, and then he turned his phone off. He fit the description given by the witness to the shooting. When police tried to arrest him, he jumped off a balcony to try to escape. His codefendant, Dike, told someone in jail that he and Williams intended to rob the victim of marijuana. The evidence showed that Peña had marijuana in her possession immediately before her death but had very little after, suggesting she had been robbed.

We hold that the evidence was sufficient for a rational juror to find Williams guilty beyond a reasonable doubt. We overrule Williams's first issue.

## II.    Admissibility of Expert Testimony

In his second issue, Williams asserts that the trial court erred in admitting testimony from a Department of Public Safety analyst about cell phone location tracking. He argues that the court abused its discretion in admitting the testimony because the analyst did not know her methodology's error rate. The State responds that the analyst was qualified to opine on the location of cell phones, and her lack

7

of knowledge regarding error rates in the underlying software did not impact the reliability of her opinion that the cell phone was near the pharmacy around the time of the murder.

### A.     Standard of Review

We review the trial court's decision to allow expert testimony for an abuse of discretion. *Gallo v. State*, 239 S.W.3d 757, 765 (Tex. Crim. App. 2007). We will uphold a trial court's ruling on the admissibility of an expert witness as long as it falls within the zone of reasonable disagreement. *Taylor v. State*, 268 S.W.3d 571, 579 (Tex. Crim. App. 2008). Absent a clear abuse of discretion, the trial court's decision to admit or exclude expert testimony will not be disturbed. *Wyatt v. State*, 23 S.W.3d 18, 27 (Tex. Crim. App. 2000).

The court considers three conditions in admitting a witness as an expert: "(1) the witness qualifies as an expert by reason of his knowledge, skill, experience, training, or education; (2) the subject matter of the testimony is an appropriate one for expert testimony; and (3) admitting the expert testimony will actually assist the fact-finder in deciding the case." *Rodgers v. State*, 205 S.W.3d 525, 527 (Tex. Crim. App. 2006); *see Kelly v. State*, 824 S.W.2d 568, 573 (Tex. Crim. App. 1992); *see also* TEX. R. EVID. 702. These conditions are commonly referred to as qualification, reliability, and relevance. *Vela v. State*, 209 S.W.3d

128, 131 (Tex. Crim. App. 2006). Before admitting expert testimony, the trial court must determine that all three conditions are met. *Id.*

### B. Analysis

The State called Elizabeth Buhay, an analyst with the Department of Public Safety's Telephone Records Analysis Center (TRAC) as an expert to testify on the approximate location of Peña's cell phone and a cell phone linked to Williams based on historical phone records and a list of the coordinates of Houston area cell phone towers provided by carriers to law enforcement. The cell phone records were admitted into evidence without objection during a detective's testimony. The detective testified that he sent the records to the TRAC analyst for mapping.

The trial court held a hearing outside the presence of the jury to consider Williams's motion to exclude Buhay's testimony. At the hearing, Buhay testified about her qualifications to opine on these subjects. She stated that she had worked as a crime analyst for three years and was trained in cell phone mapping by the FBI, the Department of Public Safety, and an outside company. During her career, she had worked on hundreds of cases to identify the location of a cell phone using records. Buhay testified that cell phones ping a nearby tower when in use and cell phone records include the coordinates for the tower. Her job is to map the tower locations using the coordinates provided in the cell phone records. The records are

9

uploaded digitally to a mapping software. She uses the software to create a map of calls or texts over time or in a specific area.

Buhay testified that she employs these techniques on a daily basis. For this particular investigation, she received a request from Texas Ranger P. Luna to review phone records for three different cell phones. Although Luna provided her with the records from the carrier, Buhay also requested the original records from the carrier to verify her work. She determined the location of the phone when it pinged a cell phone tower. She attached details from the call or text to each point, including the time and the person the phone was contacting,[2] and she plotted the data on maps, showing where a particular phone was located throughout the day and what cell tower it contacted when it was being used.

Williams argues that Buhay's opinion was unreliable because she admitted that there were newer software programs available to plot the data, and she was unaware of the current program's error rate. Texas Rule of Evidence 705(c) governs the reliability of expert testimony. It states that "[a]n expert's opinion is inadmissible if the underlying facts or data do not provide a sufficient basis for the opinion." TEX. R. EVID. 705(c). The reliability inquiry is flexible, at times focusing on the reliability of scientific knowledge, at other times on the expert's personal knowledge and experience. *Vela*, 209 S.W.3d at 134. Experience alone may

---

[2]    The investigator testified earlier in the trial that the cell phone records do not include the substance of the text messages.

10

provide a sufficient basis for an expert's testimony. *Id.* The proponent of the expert must establish some foundation for the reliability of the expert's opinion. *Id.*

To be considered reliable, evidence from a scientific theory must satisfy three criteria: "(a) the underlying scientific theory must be valid; (b) the technique applying the theory must be valid; and (c) the technique must have been properly applied on the occasion in question." *Coble v. State*, 330 S.W.3d 253, 273 (Tex. Crim. App. 2010) (quoting *Kelly*, 824 S.W.2d at 573). When "soft" sciences are at issue, the trial court must inquire "(1) whether the field of expertise is a legitimate one, (2) whether the subject matter of the expert's testimony is within the scope of that field, and (3) whether the expert's testimony properly relies upon and/or utilizes the principles involved in the field." *Id.* (quoting *Nenno v. State*, 970 S.W.2d 549, 561 (Tex. Crim. App. 1998)). "This inquiry is somewhat more flexible than the *Kelly* factors applicable to Newtonian and medical science." *Coble*, 330 S.W.3d at 273. The general principles announced in *Kelly* apply, but the specific factors may, or may not apply depending on the context. *Id.* Under both *Kelly* and *Nenno*, reliability should be evaluated with reference to the standards applicable to the particular professional field in question. *Id.*

The task Buhay was called upon to perform was not complex and it was verifiable. *See Thompson v. State*, 425 S.W.3d 480, 489 (Tex. App.—Houston [1st Dist.] 2012, pet. ref'd) ("The complexity of the technique employed in this case to

11

interpret the [cell phone] records is not great—[the witness] only needed to know how the records were produced and what the data in each column signified."); *Robinson v. State*, 368 S.W.3d 588, 601 (Tex. App.—Austin 2012, pet. ref'd) ("The analysis is straightforward and not particularly complex."). Buhay was tasked with mapping the location of cell phones using the location of towers identified in each phone's records. She testified that she was trained in cell phone mapping, employed the techniques daily, and had three years of experience doing it. The plotting software's error rate did not impact the reliability of her opinions. The cell phone records showed the exact tower to which the phone connected, and Buhay testified that she checked the records for accuracy. *See Thompson*, 425 S.W.3d at 488–89 (rejecting challenge to expert opinion based on argument it was possible defendant's cell phone was located miles away from tower shown in records). We conclude that the trial court did not abuse its discretion when it determined that Buhay's opinion on the general location of Williams's and the victim's cell phones was reliable. We overrule William's second issue.

III.     **Admissibility of Coconspirator's Statements**

Williams asserts that the trial court erred when it overruled his objections to introduction of certain statements made by Robert Dike to Demond Walton. Walton testified about what his cellmate, Robert Dike, told him while they were

incarcerated. Williams argues that the statements violated his rights under the Confrontation Clause and were inadmissible hearsay.

### A.     Confrontation Clause

The Confrontation Clause prohibits the admission of "testimonial hearsay" unless the declarant is unavailable to testify and the defendant had a prior opportunity to cross-examine the declarant. *Crawford v. Washington*, 541 U.S. 36, 53, 68 (2004); *see* U.S. CONST. amend. VI. Texas Rule of Evidence 801(d) defines hearsay as a statement, other than one made by the declarant while testifying at a trial or hearing, offered in evidence to prove the truth of the matter asserted. TEX. R. EVID. 801(d). Testimonial statements include, at a minimum, "prior testimony at a preliminary hearing, before a grand jury, or at a former trial" and "police interrogations." *Crawford*, 541 U.S. at 68; *Woods v. State*, 152 S.W.3d 105, 113 (Tex. Crim. App. 2004). Whether a statement is testimonial and therefore subject to the accused's right to confrontation is a question of law we review de novo. *See Langham v. State*, 305 S.W.3d 568, 576 (Tex. Crim. App. 2010). In making the determination whether a particular statement is testimonial, we consider whether the statement was (1) ex parte in-court testimony or its functional equivalent, (2) extrajudicial statements contained in formalized testimonial materials, or (3) statements that were made under circumstances that would lead an objective witness to reasonably believe that the statement would be available for use at a

later criminal prosecution. *Melendez v. Massachusetts*, 557 U.S. 305, 309–10 (2009) (quoting *Crawford*, 541 U.S. at 51–52); *Langham*, 305 S.W.3d at 576.

The Supreme Court specifically distinguished a defendant's statements to police from his statements to friends, noting that "[a]n accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not." *Crawford*, 541 U.S. at 51. Further, the Court has ruled that a statement is not testimonial if its primary purpose is not to create an out-of-court substitute for trial testimony. *Michigan v. Bryant*, 562 U.S. 344, 358 (2011) (noting that "the most important instances in which the [Confrontation] Clause restricts the introduction of out-of-court statements are those in which state actors are involved in a formal, out-of-court interrogation of a witness to obtain evidence for trial").

Williams argues that his coconspirator's statement to Walton should be considered testimonial based on a generalized idea that all statements one inmate makes to another about a case are made with the knowledge that the statement could be available for potential use at a later criminal prosecution. But the fact that Dike and Walton were incarcerated at the time of their conversations did not make the statements testimonial.[3] Walton testified that he and Dike became friends while

---

[3]     S*ee Rodriguez v. State*, Nos. 07-15-00412-CR & 07-16-00124-CR, 2016 WL 7439189, at *3 (Tex. App.—Amarillo Dec. 21, 2016, no pet.) (mem. op., not designated for publication) (noting that incarcerated declarant's knowledge that

14

in jail and as friends, they shared information about why they were in jail. Here, the primary purpose of Walton's statements to Dike was not to create an out-of-court substitute for trial testimony. *See Espinoza v. Thaler*, No. 2:11-CV-00146, 2012 WL 774989, at *8 (S.D. Tex. Mar. 8, 2012) (noting trial court's finding that recorded jailhouse phone conversations were not testimonial statements because they were initiated by co-defendant, not by law enforcement, and such conversations were co-defendant's spontaneous statements to private persons). We conclude that the statements were not testimonial, and the trial court did not violate the Confrontation Clause by admitting Walton's testimony into evidence.

## B.    Hearsay

Williams also argues that the trial court erred in admitting the testimony because it was hearsay. Walton testified that Dike told him he and Williams intended to rob Peña of drugs on the day of the murder.

Generally, the hearsay rule excludes any out-of-court statements offered by a party at trial to prove the truth of the matter asserted in the statement. TEX. R. EVID. 801(d) (defining hearsay); TEX. R. EVID. 802 (admissibility of hearsay); *Walter v. State*, 267 S.W.3d 883, 889 (Tex. Crim. App. 2008). One of the

---

phone conversation could be used in later criminal proceeding did not make recorded statements testimonial); *see also Townsend v. State*, No. 03-17-00495-CR, 2018 WL 3978489, at *3 (Tex. App.—Austin Aug. 21, 2018, no pet.) (mem. op., not designated for publication) (recorded statements of defendant, co-defendant, and another inmate in three-way jailhouse phone call were not testimonial and made between acquaintances);

exceptions to the hearsay rule allows the admission of statements made against the declarant's interest. TEX. R. EVID. 803(24). This exception permits admission of a statement that:

> (a) a reasonable person in the declarant's position would have made only if the person believed it to be true because, when made, it was so contrary to the declarant's proprietary or pecuniary interest or had so great a tendency to invalidate the declarant's claim against someone else or to expose the declarant to civil or criminal liability or to make the declarant an object of hatred, ridicule, or disgrace; and

> (b) is supported by corroborating circumstances that clearly indicate its trustworthiness, if it is offered in a criminal case as one that tends to expose the declarant to criminal liability.

*Id.* The rationale behind admitting these types of statements "stems from the commonsense notion that people ordinarily do not say things that are damaging to themselves unless they believe they are true." *Walter*, 267 S.W.3d at 890. "[A] reasonable person would not normally claim that he committed a crime, unless it were true." *Id.*

Rule 803(24) sets out a two-step foundation requirement for admissibility of hearsay statements. *Id.*; *Coleman v. State*, 428 S.W.3d 151, 158 (Tex. App.— Houston [1st Dist.] 2014, pet. ref'd). First, the trial court must determine whether the statement subjects the declarant to criminal liability and whether the declarant realized this when he made the statement. *Walter*, 267 S.W.3d at 890–91. Second, the trial court must then determine whether sufficient corroborating circumstances exist that clearly indicate the trustworthiness of the statement. *Id.* at 891.

16

Both statements that are directly against the declarant's interest and collateral "blame-sharing" statements that implicate both the declarant and others may be admissible under Rule 803(24) if corroborating circumstances clearly indicate their trustworthiness. *Id.* at 896. "Blame-shifting" statements that implicate another person but minimize the declarant's culpability are not admissible under this rule, absent extraordinary circumstances. *Id.*; *see also Guidry v. State*, 9 S.W.3d 133, 149 (Tex. Crim. App. 1999) (holding statements inadmissible under Rule 803(24) because statements were "not so equally against both [the declarant's] and [the defendant's] interests as [to] reach this level of reliability"). The trial court is "obligated to parse a generally self-inculpatory narrative and weed out those specific factual statements that are self-exculpatory or shift blame to another." *Walter*, 267 S.W.3d at 897.

The determination of whether corroborating circumstances clearly indicate trustworthiness lies within the trial court's discretion. *Mason v. State*, 416 S.W.3d 720, 734 (Tex. App.—Houston [14th Dist.] 2013, pet. ref'd) (citing *Cunningham v. State*, 877 S.W.2d 310, 313 (Tex. Crim. App. 1994)). When analyzing the sufficiency of corroborating circumstances, a number of factors are relevant: (1) whether the guilt of the declarant is inconsistent with the guilt of the defendant; (2) whether the declarant was so situated that he might have committed the crime; (3) the timing of the declaration; (4) the spontaneity of the declaration; (5) the

relationship between the declarant and the party to whom the statement was made; and (6) the existence of independent corroborative facts. *Woods v. State*, 152 S.W.3d 105, 113 (Tex. Crim. App. 2004); *Coleman*, 428 S.W.3d at 159. The first two factors are not relevant when, as here, the statements are offered by the State to inculpate the defendant. *Woods*, 152 S.W.3d at 113. The trial court may consider evidence which undermines the reliability of the statement as well as evidence corroborating its trustworthiness. *Mason*, 416 S.W.3d at 734 (citing *Cunningham*, 877 S.W.2d at 312).

We first consider whether the statements admitted by the trial court subject Dike to criminal liability and whether he recognized that at the time he made the statements. *See Walter*, 267 S.W.3d at 890–81. Walton testified that Dike told him that he and Williams intended to rob the victim of marijuana. The statement places Dike at the scene of the murder with Williams, and therefore subjects him to criminal liability for attempted robbery at a minimum. The statement implicates both Williams and Dike equally. *See Walter*, 267 S.W.3d at 899 ("[O]ut-of-court statements from a co-defendant that are against the declarant's penal interest but also inculpate the defendant are viewed with some suspicion. That suspicion is lessened when the speaker makes no distinction between his conduct and that of the defendant—where there is absolute equality."). The trial court could have reasonably concluded that Dike recognized at the time he spoke with his cellmate

that admitting he intended to participate in a robbery was against his penal interest. *See Coleman*, 428, S.W.3d at 160 (trial court could conclude that defendant knew that telling his girlfriend he had participated in a murder was against his penal interest). A reasonable person would have understood that admitting to attempted robbery was against his interest.

We now must determine whether sufficient corroborating circumstances indicate the trustworthiness of Dike's statements to Walton. Dike spoke with Walton while both were incarcerated in county jail. He made the statements gradually, over time, as they became friends and in a private setting. *See Woods*, 152 S.W.3d at 113 ("These were 'street corner' statements that Rhodes made to his friends without any motive to shift blame to another or minimize his own involvement in the murders."); *Dewberry v. State*, 4 S.W.3d 735, 751–52 (Tex. Crim. App. 1999) (considering, in holding that hearsay statements were admissible, that statements were either spontaneously made or made in response to casual inquiries from "friends and criminal acquaintances not connected to the commission of the offense").

The State also presented independent corroborative evidence that verified Dike's statements to Walton. The State introduced phone records that showed that Williams was communicating with the victim up to the point of her death regarding meeting up with her and purchasing marijuana. A cell record expert explained the

location of William's phone during that conversation. The expert also opined that Williams's phone and the victim's phone pinged the same cell tower at the nearest time to the shooting. Evidence suggested a robbery was planned, including evidence that a gun was involved and that law enforcement did not find two ounces of marijuana with the victim. Law enforcement testified that they found less than a gram of marijuana, instead of the two ounces that the victim intended to sell to Williams in the parking lot. Williams and Dike were arrested together ten days later. Cell phone tracking evidence showed that their phones were traveling together and that they were together the day of the arrest. Finally, Dike and Walton's conversations occurred soon after the murder.

We conclude that the corroborating circumstances indicate the trustworthiness of Dike's statements to Walton. We hold that the trial court did not abuse its discretion when it admitted Walton's testimony concerning the statements that Robert Dike made to him. We overrule Williams's third issue.

## Conclusion

We affirm the judgment of the trial court.

Peter Kelly
Justice

Panel consists of Justices Keyes, Kelly, and Goodman.

Publish.  TEX. R. APP. P. 47.2(b).