**Opinion issued November 26, 2024**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-22-00178-CR

———————————

**DWAYNE ERNEST WHARTON, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 262nd District Court**
**Harris County, Texas**
**Trial Court Case No. 1756465**

---

## O P I N I O N

A jury convicted Dwayne Ernest Wharton of capital murder.[1]  The trial court

assessed his punishment at confinement for life without parole.  In six issues,

---

[1]    *See* TEX. PENAL CODE §§ 19.02(b)(1), 19.03(a)(2).

Wharton asserts that the evidence is insufficient to support his conviction, that the trial court erred in denying his motions to suppress, and that the trial court erred in admitting hearsay evidence.

We affirm.

**Background**

On the morning of November 29, 2018, Linda Morales and her husband Leandro were at their home in Cypress, Texas. They were both in the office when they heard "a loud bang or crash." Linda initially thought a clock had fallen off the wall. Leandro went to see what happened, and as he stepped out of the office into the living room hallway, he motioned to Linda to stay where she was. Linda "saw a red dot" and immediately knew, based on her husband's training in the Marine Corps, that the red dot was a laser attached to a firearm. Linda heard someone say "Where the money at? Where the money at?" At that moment, Linda knew that someone "had broken down the door [and] was in the house." Leandro responded: "My wife has called the police."

At that point, Linda grabbed her phone and "slid down from [her] chair underneath the desk." Leandro took a few steps forward and out of Linda's line of sight. Linda, who heard "banging into walls, furniture, noises of people fighting," believed Leandro was struggling with the intruders. Linda knew at least one person

2

was in her house because she heard a voice, but she did not know how many people had entered as she only heard one voice at a time speaking and never saw anyone.

After hearing sounds of a struggle for about 30 seconds, Linda heard a gunshot and someone say "oh, shit." She had been trying to call 911, but her hands were shaking, and she was having trouble hitting the buttons. Linda waited for a few seconds and when she did not hear anything, she thought her husband had shot at and chased the intruders out. But as she walked out of the office, Linda saw her husband on the floor, with a fatal gunshot wound to his head.

Officers responding to the scene recovered a fired 9-millimeter shell casing on the dining room floor. Deputy M. McElvany, a crime scene investigator with the Harris County Sherriff's Office (HCSO), testified that there was a defect in the floor where a bullet had struck and ricocheted into an adjacent wall. The police recovered the fired bullet inside a closet located next to the office. Based on the defect in the floor and ultimate location of the bullet, Deputy McElvany testified that the gun was fired at a downward angle.

Law enforcement also obtained surveillance footage from the neighbor's home. HCSO Deputy D. Crain testified that on the morning of the murder, a UPS truck stopped at the Morales's home, left a package, and then departed. After the UPS truck left, a black Ford Fusion with a temporary front license plate "commonly used by dealerships to advertise their vehicles while they're pending issuance of a

3

hard plate" pulled into the Morales's driveway. Deputy Crain testified that due to the "bright yellow coloring and the shape and angle of the logo" on the plate, deputies were able to identify the dealership as Coast to Coast Motors. A few minutes after pulling into the Morales's driveway, the vehicle fled the scene.

Deputy McElvany testified that law enforcement discovered palm print impressions[2] on an exterior glass window near the back door of the Morales's home. He testified that he was responsible for the collection of these prints, and that it appeared to him that the prints were left by someone who "was looking through a window [while] they were pressed up against the window."

HCSO Deputy D. Payavla, a latent fingerprint examiner, testified that he was asked to analyze the two writer's palm prints collected from the Morales's house and determine whether the prints could be evaluated for a match. Deputy Payavla testified that he was ultimately able to match these two prints to a single individual— Bobby Turner.

Turner was arrested and charged with capital murder. In connection with Turner's arrest, Turned consented to a search and download of the contents of his cell phone. Deputy Crain testified that one of Turner's contacts was a "Lil Wayne." Police later connected the phone number associated with Lil Wayne to Wharton.

---

[2]  Deputy McElvany described the print as a "writer's palm" print, "like if you were placing your hand on a table writing a letter . . . that's what we refer to as the writer's palm of the hand."

At 7:19 on the morning of the murder, Wharton sent a text message to Turner saying "LMK." Deputy Crain testified that "LMK" is a "very common acronym in texting for let me know." At 7:50, Turner responded to Wharton with "tell me w[h]en you Otw." Deputy Crain testified that "otw" is also a common acronym for "on the way." Lastly, at 9:58 on the morning of the murder, Wharton sent a text message to Turner that read "I'm outside."

Deputy Crain testified that he learned during his investigation that Wharton purchased a black, 2014 Ford Fusion from Coast to Coast Motors on November 21, 2018, eight days before the murder.

Based on the above, Wharton was arrested at his apartment in the early morning hours of December 4, 2018. Wharton's common-law wife, Mariesha Alexander, was present at the time of Wharton's arrest and consented to a search of their apartment.

During the search, Deputy Crain testified that law enforcement did not recover a 9-millimeter handgun. However, they found yellow Coast to Coast temporary license plates, a backpack containing a work identification badge for Turner, three 9-millimeter magazines and assorted boxes of ammunition, and a "rail-mounted laser sight for a handgun." Deputy Crain testified that the laser sight recovered from Wharton's apartment had a power switch and agreed that it would have to be

5

switched on to activate and that it would not turn on simply by applying pressure on the trigger.

Wharton was transported to the Sheriff's Department for questioning. Although Wharton initially denied any involvement in the murder, he later admitted that he and Turner went to the Morales's neighborhood to "go get some money." They chose the Morales's house because they saw a package delivered and thought that no one was home. Wharton stated that he kicked the door down and Leandro was standing right there. Wharton said that he had the gun drawn and "demanded the cash," but that Leandro kept saying his wife had already called the police. Wharton and Turner began to wrestle with Leandro. Wharton stated that Leandro lunged for him and fell, and that Wharton tried to "pistol-whip" Leandro with the front part of the gun, but the gun accidentally went off. After the gun went off, Wharton and Turner ran from the house.

At trial, Dr. Jennifer Ross, an assistant medical examiner at the Harris County Institute of Forensic Sciences who supervised the autopsy performed on Leandro, testified that the injuries sustained by Leandro contradicted Wharton's version of how the shooting happened. Dr. Ross testified that Leandro had injuries to his knuckles, neck, knees, and lips that could be consistent with a struggle. She testified that he also had a gunshot entrance wound on the top of his head "kind of towards the back, behind the ear of the left side of the head." Dr. Ross testified that the

6

entrance wound was not a "nice round circle," but instead had "some abrasions around the edges" that were consistent with a contact gunshot wound. Dr. Ross testified that when a gun is fired, right on the scalp, "gases get under the skin and make the skin just spread out and tear like that."

Dr. Ross testified that she did not see any injuries to Leandro's head that would indicate that he had been "pistol whipped." Rather, she testified that red muzzle abrasions were apparent around the entrance wound, along with black soot along the edge of the entrance wound, which were indicative of a close contact wound from a firearm, not from being pistol whipped.

The jury convicted Wharton of capital murder.[3] This appeal followed.

## Sufficiency of the Evidence

In his first two issues, Wharton argues that the evidence is insufficient to sustain his conviction for capital murder and that the trial court should have sustained his motion for instructed verdict of not guilty because the State did not prove intent.[4] Wharton argues that we should render a judgment of acquittal or, in the alternative, reform the judgment to reflect a conviction for the lesser-included-

---

[3] *See* TEX. PENAL CODE §§ 19.02(b)(1), 19.03(a)(2).

[4] Because Wharton challenges only the sufficiency of the evidence to support the intent element, we do not address the sufficiency of the evidence to support any other element. *See, e.g.*, *Murray v. State*, 457 S.W.3d 446, 448 n.1 (Tex. Crim. App. 2015) ("We solely address the sufficiency of the evidence as it pertains to the element of 'operating' in the DWI statute because Appellant challenged only that element of the statute.").

offense of felony murder and remand for new sentencing. Although Wharton also challenges the admission of various pieces of evidence in his remaining issues, we address this sufficiency issue first and, in doing so, "must consider all evidence which the jury was permitted, whether rightly or wrongly, to consider." *Moff v. State*, 131 S.W.3d 485, 488 (Tex. 2004) (quoting *Thomas v. State*, 753 S.W.2d 688, 695 (Tex. Crim. App. 1988)).

## A.  Standard of Review

A challenge on appeal to the denial of a motion for directed verdict is a challenge to the legal sufficiency of the evidence and is reviewed under the same standard. *Williams v. State*, 937 S.W.2d 479, 482 (Tex. Crim. App. 1996); *Williams v. State*, 582 S.W.3d 692, 700 (Tex. App.—Houston [1st Dist.] 2019, pet. ref'd). Every criminal conviction must be supported by legally sufficient evidence as to each element of the offense that the State is required to prove beyond a reasonable doubt. *See Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Adames v. State*, 353 S.W.3d 854, 859 (Tex. Crim. App. 2011). To determine whether this standard has been met, we review all the evidence in the light most favorable to the verdict and decide whether a rational factfinder could have found the essential elements of the crime beyond a reasonable doubt. *Jackson*, 443 U.S. at 318–19; *Brooks v. State*, 323 S.W.3d 893, 901–02 (Tex. Crim. App. 2010). Our review of "all of the evidence"

includes evidence that was properly and improperly admitted. *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007).

It is presumed that the factfinder resolved any conflicting inferences in favor of the verdict, and a reviewing court defers to that resolution. *See Jackson*, 443 U.S. at 326; *Clayton*, 235 S.W.3d at 778. Moreover, we must defer to the factfinder's evaluation of the credibility and weight of the evidence. *See Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007).

## B.    Applicable Law

Wharton was charged with committing the offense of capital murder. A person commits the offense of capital murder if the person commits murder as defined under section 19.02(b)(1) and, relevant here, the person intentionally commits the murder in the course of committing or attempting to commit burglary or robbery.[5] TEX. PENAL CODE § 19.03(a)(2). A person commits the offense of murder if he intentionally or knowingly causes the death of an individual. *Id.* § 19.02(b)(1). "A person acts intentionally, or with intent, with respect to the nature of his conduct or to a result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result." *Id.* § 6.03(a).

---

[5]    The intent to kill element of capital murder makes it distinguishable from the lesser-included offense of felony murder. *See Threadgill v. State*, 146 S.W.3d 654, 665 (Tex. Crim. App. 2004). Felony murder is an unintentional murder committed in the course of committing a felony while capital murder includes an intentional murder committed in the course of a burglary or robbery. *See id.*

## C.    Analysis

Wharton contends that the evidence that he accidentally shot Leandro after a struggle and then immediately fled the scene leaving Leandro's wife unharmed negates the element of intent to kill.  We disagree.

A jury may infer a defendant's intent from any facts tending to prove its existence, including the method of committing the crime, the nature of the wounds inflicted on the victim, and the accused's acts, words, and conduct. *Hart v. State*, 89 S.W.3d 61, 64 (Tex. Crim. App. 2002) (citation omitted).  Generally, a jury may infer an intent to kill from the use of a deadly weapon unless the manner of the weapon's use makes it reasonably apparent that death or serious bodily injury could not have resulted. *Jones v. State*, 944 S.W.2d 642, 647 (Tex. Crim. App. 1996).  A firearm is a deadly weapon per se. *Dukes v. State*, 486 S.W.3d 170, 177 (Tex. App.—Houston [1st Dist.] 2016, no pet.) (citing TEX. PENAL CODE § 1.07(a)(17)(A) (defining "deadly weapon" to include firearms)).

When a defendant fires a deadly weapon at close range and death results, the law presumes an intent to kill. *Sholars v. State*, 312 S.W.3d 694, 703 (Tex. App.—Houston [1st Dist.] 2009, pet. ref'd); *Childs v. State*, 21 S.W.3d 631, 635 (Tex. App.—Houston [14th Dist.] 2000, pet. ref'd).  "Naturally, the most obvious cases and the easiest ones in which to prove a specific intent to kill, are those cases in which a firearm was used and was fired or attempted to have been fired at a person."

*Godsey v. State*, 719 S.W.2d 578, 581 (Tex. Crim. App. 1986); *see also Adanandus v. State*, 866 S.W.2d 210, 215 (Tex. Crim. App. 1993).

Here, the evidence shows that Wharton arrived at the Morales's residence with a loaded firearm, fitted with a laser sight. The laser sight recovered from Wharton's apartment had a power switch that had to be switched on to activate—it would not turn on simply by applying pressure on the trigger. Wharton admitted that he kicked down the door of the Morales's residence, and once he saw Leandro in the house, he drew his gun. Although Wharton claims the gun accidentally went off during a struggle when he pistol whipped Leandro, he admitted that he "shot the man in his head." "Evidence that the defendant arrived at the scene of the crime carrying a loaded weapon is probative of deliberate conduct." *Adanandus*, 866 S.W.2d at 216. The use of a deadly weapon (here, a firearm), itself, constitutes more than a "mere modicum" of evidence of intent to kill. *Hollins v. State*, No. 01-14-00744-CR, 2015 WL 5076298, at *4 (Tex. App.—Houston [1st Dist.] Aug. 27, 2015, pet. ref'd) (mem. op., not designated for publication). And when, as here, "a deadly weapon is fired at close range, and death results, the law presumes an intent to kill." *Sholars*, 312 S.W.3d at 703.

The fact that there was some evidence of a struggle does not negate the State's proof of intent to kill. *See Adanandus*, 866 S.W.2d at 216 ("[E]vidence of a struggle

does not necessarily negate deliberate conduct.").[6] Although Wharton stated that he accidentally shot Leandro during a struggle, the jurors, as the exclusive judges of the facts, the credibility of the witnesses, and the weight to be given their testimony, were free to disbelieve Wharton's statement, and we must defer their evaluation of the credibility and weight of the evidence. *See Jackson*, 443 U.S. at 326; *Clayton*, 235 S.W.3d at 778; *Williams*, 235 S.W.3d at 750.

Moreover, the nature of Leandro's injuries as described in Dr. Ross's testimony supports the finding of intent to kill. She testified that the cause of death was a gunshot wound to the head, and the manner of death was homicide. She described the entrance wound as a close contact wound and testified that red abrasions could be seen around the wound where the muzzle of the gun was touching Leandro's skin when it was fired. Photographs of the entrance wound also show black soot on the edge of the wound and a piece of unburned gunpowder. Dr. Ross testified that black soot is also visible on the soft tissue underneath the skin and on the underlying skull, indicating that it was a close contact wound. She testified that the entrance wound was not consistent with being pistol whipped or other blunt force injury.

---

[6] *See Flagg v. State*, No. 01-21-00433-CR, 2022 WL 2347907, at *3 (Tex. App.—Houston [1st Dist.] June 30, 2022, no pet.) (mem. op., not designated for publication) (holding evidence of struggle did not negate intent to kill where evidence showed appellant dragged victim from her car and shot her in back).

Considering Dr. Ross's testimony and other evidence above, the evidence supports an implied finding by the jury that Wharton aimed the handgun at Leandro, at close enough range to leave muzzle abrasions on his skin, and fired. *See Sholars*, 312 S.W.3d at 704; *see also Hollins*, 2015 WL 5076298, at *4–5.

Wharton further argues that the evidence that he said "oh shit," then immediately fled the scene and did not harm Linda or take anything of value, negates the intent element. But these actions taken after the fact, "although indicative of regret, are not incompatible with the inference that appellant possessed the requisite intent at the critical moment when he shot [Leandro]." *See Watts v. State*, No. 14-12-00862-CR, 2014 WL 1516082, at *3 (Tex. App.—Houston [14th Dist.] Apr. 17, 2014, pet. ref'd) (mem. op., not designated for publication) (rejecting appellant's argument that his actions after shooting complainant, such as applying pressure to neck wound and saying he was sorry, were evidence that shooting was accidental, and that appellant lacked requisite intent to kill).

Viewing all of the evidence in the light most favorable to the jury's verdict, we conclude that a rational trier of fact could have reasonably found that Wharton intentionally caused Leandro's death. *See* TEX. PENAL CODE §§ 19.02(b)(1), 19.03(a)(2). Accordingly, we hold that the evidence is legally sufficient to support Wharton's conviction for the offense of capital murder.

We overrule Wharton's first and second issues.

## Motions to Suppress

In his third, fourth, and fifth issues, Wharton challenges the trial court's denial of his pretrial motions to suppress. Before trial, Wharton filed two motions to suppress. In the first, Wharton moved to suppress his statements made to law enforcement after his arrest on December 4, 2018. In the second, Wharton argued that law enforcement obtained Global Positioning System (GPS) data from his vehicle without a warrant and relied on that GPS data to support his arrest warrant. Wharton contends that the GPS data was obtained in violation of the Fourth Amendment to the United States Constitution and the Texas Constitution and that, without that illegally obtained GPS data, law enforcement lacked probable cause for his arrest. Accordingly, he also moved to suppress all evidence obtained as a result of his allegedly illegal arrest, including his statements, cellphone, laser sight, and vehicle. The trial court denied both motions.

### A. Standard of Review

Generally, we review a trial court's ruling on a motion to suppress evidence under a bifurcated standard. *Sims v. State*, 569 S.W.3d 634, 640 (Tex. Crim. App. 2019). We review the trial court's determination of legal questions and its application of the law to facts that do not turn upon a witness's credibility de novo. *Id.* We afford "almost total deference" to the trial court's "findings of historical fact and determinations of mixed questions of law and fact that turn on credibility and

14

demeanor . . . if they are reasonably supported by the record." *Id.* When a trial court denies a motion to suppress, we will uphold that ruling under any theory of the law applicable to the case. *Id.*

We must view the evidence in the light most favorable to the trial court's ruling. *Wiede v. State*, 214 S.W.3d 17, 24 (Tex. Crim. App. 2007); *State v. Kelly*, 204 S.W.3d 808, 818 (Tex. Crim. App. 2006). When the trial court does not make explicit findings of fact, we imply the necessary fact findings that would support the trial court's ruling if the evidence, viewed in the light most favorable to the trial court's ruling, supports those implied findings. *State v. Garcia-Cantu*, 253 S.W.3d 236, 241 (Tex. Crim. App. 2008); *see Wiede*, 214 S.W.3d at 25.

**B.     Suppression of Custodial Statements**

In his third issue, Wharton argues that the trial court erred in overruling his motion to suppress his custodial statements made after he invoked his Fifth and Sixth Amendment rights to counsel because (1) he did not reinitiate communication with law enforcement; (2) even if he did reinitiate communication, he did not waive his right to counsel; and (3) the State failed to strictly comply with the requirements of article 38.22(3)(a) of the Texas Code of Criminal Procedure.

### 1. Wharton's Interview

Shortly after midnight on December 4, 2018, deputies executed a pocket warrant[7] for Wharton's arrest. Wharton was taken to the Harris County Sherriff's Office and was interviewed by Deputies M. Quintanilla and D. Crain. The entire interview was recorded, and the recording was introduced in its entirety at the suppression hearing as State's Exhibit 1.

The interview began at approximately 2:12 a.m. At the beginning of the interview, Deputy Quintanilla confirmed that Wharton was not present voluntarily, and proceeded to read Wharton his *Miranda* rights. After reading Wharton each right, Deputy Quintanilla asked, "Do you understand that?" Each time, Wharton nodded and responded "Yes, sir." After reading Wharton his rights, Deputy Quintanilla stated: "Like I said, we would like to talk to you. And you know we have some questions we want to ask you, tell you some stuff and I'm pretty sure you want to ask stuff. Do you want to continue?" Wharton said, "Yes sir."

Wharton then provided information to the interviewing officers, including his name, date of birth, address, and cell phone number. Deputies Quintanilla and Crain questioned Wharton about his whereabouts and involvement in the murder, and

---

[7] Deputy Quintanilla testified that unlike a standard warrant, a pocket warrant does not go into the system so the suspect does not know there is a warrant out for his arrest.

Wharton denied any involvement, stating that he had loaned his 2014 Ford Fusion to his friend, Turner, the week before, who said he needed the car to go to a job interview.  After about 30 minutes of questioning, Wharton asked: "Okay, well if I wanted to explain anything, can I have a lawyer or something?"  Deputies told Wharton they would make some calls and come back to let him know what would happen next, then terminated the interview.

Deputy Quintanilla left the interview room and began preparing the necessary paperwork for bringing capital murder charges against Wharton.  Deputy Crain escorted Wharton from the interview room to the Automated Fingerprint Identification System (AFIS) machine to process him for fingerprints and photographs.  Once Wharton returned to the interview room, Deputy Crain digitally photographed Wharton, recovered his clothing as items of potential evidence, and provided Wharton with a paper jumpsuit.

At approximately 4:30 a.m., Deputy M. Pilkinton handcuffed Wharton and escorted him from the interview room to transport him to the jail facility.  The recording continued, but Wharton was not in the interview room.  But only a few minutes later, at approximately 4:33, Wharton returned to the interview room.  Deputy Quintanilla entered the interview room after Wharton, and the following exchange occurred:

> Quintanilla:  Alright Dwayne, I guess you were getting taken out of here.  You were going to go get taken to booking.

|              | And you requested to come back here and talk to us. Is that correct? |
| Wharton:     | Yes sir. |
| Quintanilla: | Okay. You still remember the rights that I read to you? Okay and are you willing to talk to me about what's going on? |
| Wharton:     | Yes, but I just want my wife. |
| Quintanilla: | Okay. Let me just tell you before we do anything. Nobody promised you anything, nobody threatened you, nobody coerced you to come back here and reinitiate your conversation? Is that correct? |
| Wharton:     | No sir. |
| Quintanilla: | Okay, uh, its 4:37 a.m. What do you need to say, Dwayne? |
| Wharton:     | I accidentally shot the man in his head. |

Thereafter, Wharton provided details of the murder to Deputy Quintanilla.

## 2. Fifth Amendment Right to Counsel

Wharton first argues that his custodial statement should have been suppressed because he did not reinitiate communication with law enforcement after he invoked his right to counsel, as impliedly found by the trial court.[8]

---

[8] We note that the State argues that Wharton did not clearly and unequivocally invoke his right to counsel when he said, "If I wanted to explain anything, can I have a lawyer or something." The State contends that this was a conditional statement that was insufficient to clearly invoke the right to counsel and, therefore, the investigators were not legally required to cease further questioning. We assume for the sake of this opinion that Wharton's initial statement clearly invoked his right to counsel.

To protect the privilege against self-incrimination guaranteed by the Fifth Amendment, police may not conduct a custodial interrogation of a suspect who has requested the assistance of counsel.[9] *Minnick v. Mississippi*, 498 U.S. 146, 147 (1990); *Edwards v. Arizona*, 451 U.S. 477, 484–85 (1981). In *Edwards*, the United States Supreme Court set out a bright-line rule "designed to protect an accused in police custody from being badgered by police officers." *Oregon v. Bradshaw*, 462 U.S. 1039, 1044 (1983) (discussing *Edwards*). Once an individual in custody invokes his right to counsel, "interrogation 'must cease until an attorney is present.'" *Edwards*, 451 U.S. at 485 (quoting *Miranda v. Arizona*, 384 U.S. 436, 474 (1966)). Thus, "when an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights." *Id.* at 484. Rather, if an accused has expressed his desire to deal with police only through counsel, he "is not subject to further interrogation by the authorities until counsel has been made available to him, unless

---

[9] The Texas Court of Criminal Appeals, like the Fifth Circuit, has acknowledged that the term Fifth Amendment right to counsel is somewhat of a misnomer "to the extent that it indicates that the Fifth Amendment itself creates a right to counsel." *Pecina v. State*, 361 S.W.3d 68, 75 n.16 (Tex. Crim. App. 2012) (quoting *Goodwin v. Johnson*, 132 F.3d 162, 179 n.12 (5th Cir. 1997)). "The rights created by *Miranda*, including the right to have counsel present during custodial interrogation, are not themselves rights protected by the Constitution but are instead measures to [e]nsure that the right against compulsory self-incrimination is protected." *Id.* (quoting *Goodwin*, 132 F.3d at 179 n.12).

19

the accused himself initiates further communication, exchanges, or conversations with the police." *Id.* at 484–85.

Thus, *Edwards* requires that before a subject in custody can be subjected to further interrogation after he requests an attorney, there must be a showing that the suspect reinitiated dialogue with the authorities. *See id.* Once a suspect has invoked his right to counsel, his unwillingness to communicate with authorities without the presence of counsel "is presumed to persist unless the suspect himself initiates further conversation about the investigation." *Cross v. State*, 144 S.W.3d 521, 526 (Tex. Crim. App. 2004).

The United States Supreme Court has established a two-step procedure to determine whether a suspect has waived his previously invoked right to counsel. *See Bradshaw*, 462 U.S. at 1045–46. The first step requires proof that the suspect himself initiated further communication with the authorities after invoking the right to counsel. *Id.*; *Cross*, 144 S.W.3d at 527. The second step requires proof that, after he reinitiated communication with the authorities, the suspect validly waived the right to counsel. *Bradshaw*, 462 U.S. at 1045–46; *Cross*, 144 S.W.3d at 527. "Once this two-step waiver requirement is shown, the suspect has countermanded his original election to speak to authorities only with the assistance of counsel [and] [t]he *Edwards* rule is fully satisfied." *Cross*, 144 S.W.3d at 527.

20

At the hearing on the motion to suppress, the trial court heard testimony regarding the interactions between Wharton and deputies after he initially invoked his right to counsel and the circumstances surrounding his later reinitiation of communication with the deputies. Deputy Pilkinton testified that he escorted Wharton out of the interview room to transport him to jail. He explained that as he was escorting Wharton out of the interview room, down the hall, and to his patrol vehicle, he realized that Wharton's AFIS paperwork and other property were in a bag at the AFIS machine at the end of the hallway. Pilkinton testified that he asked Lieutenant Schields, who was helping him escort Wharton to the patrol vehicle, to stand with Wharton while he went back to get the AFIS paperwork. Pilkinton retrieved the paperwork and when he came back to where Wharton was standing with Schields, Schields said Wharton wanted to talk to investigators again. Pilkinton testified that it takes about 25 to 35 seconds to walk from where he was standing to the AFIS machine and back, and that Wharton was out of the interview room (and off camera) for a total of two-and-a-half to three minutes.

Lieutenant Schields provided similar testimony. He was assisting Deputy Pilkinton with transporting Wharton to the patrol vehicle, when Pilkinton left momentarily to retrieve some missing paperwork. Schields testified that Pilkinton asked him to watch Wharton "for a second while he double checked to make sure he had the proper documentation to go book him." Schields testified that he was alone

21

with Wharton for "a minute, minute and a half or so."  Schields testified that he did

not initiate any conversation with Wharton during the time they were alone.  Schields

further testified:

[State]:          Did the Defendant state anything to you?

[Schields]:       No, but I looked at him and when he looked back at me, he told me that -- he said something to the fact, y'all are gonna get your testimony.

[State]:          So, prior to that did you say anything to the Defendant?

[Schields]:       No, I did not.

[State]:          Did you make any sort of gesture with the intent to have him continue a statement to you?

[Schields]:       No, I did not.

[State]:          Nothing like no head movements, no body posture, anything?

[Schields]:       No, sir.

[State]:          Did you make any gestures or movements or anything to try to coerce or entice the Defendant to continue speaking to you or other investigators?

[Schields]:       Absolutely not.

[State]:          So, the first vocal interaction between the two of you, you said you looked at the Defendant and he said to you, "You're gonna get your testimony"?

[Schields]:       Yeah, he looked down.  He's taller than me. I remember looking up, y'all are gonna get your testimony.

[State]:          And what did he say next?

22

[Schields]: "I accidentally shot that man."

Lieutenant Schields testified that he then asked Wharton if he wanted to speak to the investigators again, and Wharton responded that he did. Schields, along with Pilkinton, walked Wharton back to the interview room, and Schields informed Deputy Quintanilla that Wharton wanted to speak with them again.

In contrast, Wharton testified that Schields looked him in the eyes and said, "I know you're not a killer, but we need you to confess. We need a confession." Wharton explained that he was tired and that Schields played on his emotions and "gave [him] a stern look like [he] didn't have no other choice." Wharton testified that it was Schields who initiated contact with him in the hallway and that he did not make the initial comment to Schields that he was going to give a statement.

Although the record contains conflicting evidence regarding whether Wharton initiated further contact with the deputies, the trial court is the sole trier of fact and judge of the credibility of the witnesses and the weight to be given their testimony. *State v. Ross*, 32 S.W.3d 853, 855 (Tex. Crim. App. 2000); *Hunter v. State*, 148 S.W.3d 526, 530 (Tex. App.—Houston [14th Dist.] 2004, pet. ref'd). Viewing the evidence in the light most favorable to the trial court's ruling, the trial court could have believed Lieutenant Schields's testimony that it was Wharton who initiated contact and disbelieved Wharton's testimony that it was Schields who did so, and

23

we must defer to the trial court's implied factual findings and determinations of credibility. *See Garcia-Cantu*, 253 S.W.3d at 241; *Ross*, 32 S.W.3d at 855.

The implied finding is further supported by Wharton's recorded statements acknowledging that he requested to speak with the investigators again, and that he was not threatened or coerced into reinitiating contact with the investigators. Accordingly, we hold that the trial court did not err in finding that Wharton reinitiated contact with law enforcement. *See Hunter*, 148 S.W.3d at 530. The first step required to show that Wharton waived a previously invoked right to counsel under *Edwards* and *Bradshaw* is thus satisfied.[10]

---

[10]  Wharton also argues that the comments attributed to Lieutenant Schields—"I know you're not a killer, but we need to you confess.  We need a confession."—constituted prohibited interrogation similar to that which was struck down by the United States Supreme Court in *Rhode Island v. Innis*, 446 U.S. 291 (1980).  In *Innis*, the Supreme Court held:

> [T]he *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent.  That is to say, the term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.

446 U.S. at 300–01.  Applying that rule to the facts of the case in *Innis*, the Supreme Court held that a conversation between police officers where-in one officer said to the other "there's a lot of handicapped children running around in this area, and God forbid one of them might find a weapon with shells and they might hurt themselves," *see id.* at 294–95, was "nothing more than a dialogue between the two officers to which no response from the respondent was invited" and therefore *was not* an interrogation within the meaning of *Miranda*. 446 U.S. at 302–03.  Thus, contrary to Wharton's characterization of *Innis*, the Supreme Court did not conclude that the officers "investigative technique" in that case was prohibited.  Nevertheless, here

Once it is demonstrated that the suspect reinitiated contact with police, the next inquiry is "whether a valid waiver of the right to counsel . . . occurred, that is, whether the purported waiver was knowing and intelligent and found to be so under the totality of the circumstances, including the necessary fact that the accused, not the police, reopened the dialogue with the authorities." *Bradshaw*, 462 U.S. at 1046 (quoting *Edwards*, 451 U.S. at 486 n.9). This determination depends on the "particular facts and circumstances surrounding the case, including the background, experience, and conduct of the accused." *Id.*

We conclude that the totality of the circumstances supports the conclusion that Wharton knowingly and intelligently waived his previously invoked right to counsel. After being advised of his rights and requesting an attorney, Wharton changed his mind and reinitiated contact with police. After reinitiating contact, Wharton was reminded of his rights, agreed that he wanted to continue speaking with law enforcement and that he was not coerced into doing so by the deputies, and ultimately provided a statement that he accidentally shot Leandro. *See id.* (deferring to trial court's conclusion that statements to polygraph examiner were voluntary and result of knowing waiver based on its findings that "police made no threats, promises

we conclude that Lieutenant Schields did not engage in prohibited interrogation as described by *Innis* because Lieutenant Schields denied making the statements as alleged by Wharton, and as the sole judge of credibility, the trial court could have believed his testimony over Wharton's.

25

or inducements to talk, that defendant was properly advised of his rights and understood them and that within a short time after requesting an attorney changed his mind without any impropriety on the part of the police").

Accordingly, the admission of Wharton's custodial statements was not prohibited by the Fifth Amendment, and we hold that the trial court did not err in denying Wharton's motion to suppress on this basis.

### 3. Texas Code of Criminal Procedure Article 38.22

Wharton argues that even if he reinitiated contact with law enforcement, article 38.22 of the Texas Code of Criminal Procedure required deputies to read his statutory rights again on videotape before his second oral interview, and because they failed to do so, article 38.22 was not strictly complied with and his statement should have been suppressed.

Article 38.22 provides that no oral statement is admissible unless electronically recorded. TEX. CODE CRIM. PROC. art. 38.22, § 3(a). In addition, the accused must be warned prior to the statement and on the record that: (1) he has the right to remain silent and not make any statement at all, (2) any statement he makes may be used as evidence against him in court, (3) he has the right to have a lawyer present to advise him prior to and during any questioning, (4) that if he is unable to employ a lawyer, he has the right to have a lawyer appointed to advise him prior to

and during any questioning, and (5) he has the right to terminate the interview at any time. *Id.* art. 38.22, §§ 2(a), 3(a)(2).

In *Bible v. State*, 162 S.W.3d 234 (Tex. Crim. App. 2005), the court of criminal appeals considered whether, for purposes of both *Miranda* and article 38.22, an accused's later statement is admissible if provided without law enforcement repeating the statutory warnings. In that case, the Court determined that, when a suspect is given the required statutory warnings prior to an interview, the warnings from the first interview session remain in effect for continuing sessions if, in the totality of the circumstances, a second phase of the interview is essentially a continuation of the first. *See id.* at 241–42.

To determine whether a subsequent interview is a continuation of a prior interview, courts consider, among other factors, (1) the passage of time between the two interviews, (2) whether the interviews were conducted by the same person, (3) whether the interviews related to the same offense, and (4) whether the officer who conducted the subsequent interview asked the defendant whether he had received any earlier warnings, whether he remembered those warnings, and whether he wished to waive or invoke them. *See id.* at 242; *see also Jones v. State*, 119 S.W.3d 766, 773 n.13 (Tex. Crim. App. 2003).

Considering these factors in *Bible*, the court of criminal appeals held that two interrogation sessions taking place less than three hours apart were part of a single

interview for purposes of *Miranda* and article 38.22, despite the fact that different officers conducted the questioning during each session and each session focused on different sets of crimes, because the same officers were present during both sessions, and one of the officers briefly reminded the defendant of his rights and secured the defendant's consent to continue the interview. *Bible*, 162 S.W.3d at 241–42.

Here, considering the particular facts of this case in connection with the four factors above, we conclude that the second portion of the interview was a continuation of the first one, so that the second portion of the interview is admissible even though the full warnings were not re-read on the recording. First, the record demonstrates that Wharton was given the full warnings required by article 38.22, section 2(a) at the beginning of his recorded statement, as read to him by Deputy Quintanilla. This portion of the interview lasted about 30 minutes, until at 2:49 a.m., when Wharton invoked his right to counsel. The passage of time between the two portions of the interview was less than two hours—at 4:37 a.m., Wharton reinitiated the interview. And the entire interview was recorded on one continuous recording and took place over an approximate two-and-a-half-hour period.

Second, Wharton was interviewed by the same deputy during both portions of the interview—Deputy Quintanilla.[11] Third, both interviews related to same offense, i.e., the capital murder of Leandro. And, fourth, Deputy Quintanilla reminded Wharton on the recording of the second portion of the interview about the earlier warnings, asking, "You still remember the rights that I read to you? Okay and are you willing to talk to me about what's going on?" Wharton confirmed that he remembered the earlier rights and that he wanted to speak with Quintanilla. Wharton also confirmed that he was not threatened or coerced into reinitiating the interview and speaking with investigators.

Thus, we conclude that the two sessions were part of a single interview for purposes of article 38.22 and *Miranda*, and, therefore, the statutory warnings were not required to be re-read at the beginning of the second session.[12]

---

[11]    Deputy Crain also participated in the first portion of the interview, but he was not present during the second portion. Deputy Quintanilla was the only deputy present during the second portion of Wharton's interview.

[12]    *See Battles v. State*, No. 01-18-01082-CR, 2020 WL 2120019, at *7 (Tex. App.—Houston [1st Dist.] May 5, 2020, no pet.) (mem. op., not designated for publication) (holding that second interview was continuation of first, and full warnings did not have to be re-read on recording, because defendant was read full statutory warnings on record at beginning of first interview, interview process lasted less than eight hours, same officers conducted both interviews, both interviews related to same offense, and one officer reminded defendant of earlier warnings and received confirmation that defendant remembered earlier warnings and desired to reinitiate interview).

We also find *Hargrove v. State*, 162 S.W.3d 313 (Tex. App.—Fort Worth 2005, pet. ref'd), on which Wharton relies in support of this argument, to be distinguishable. In *Hargrove*, decided before *Bible*, the Fort Worth Court of Appeals considered whether the defendant validly waived his previously invoked Sixth Amendment right to counsel when he was not read his statutory rights before giving his second oral statement. *Id.* at 322. There, police officers conducted a first interview, during which the defendant was read his rights on videotape, but the defendant denied any involvement in the murder and robbery. *Id.* at 316–17. The defendant was formally charged and taken before a magistrate who again advised the defendant of his rights, and the defendant requested an attorney to represent him. *Id.* at 317. As the defendant was being escorted back to jail following the hearing, he requested to speak with police officers again. *Id.* After reinitiating contact with officers, the defendant was interviewed a second time on videotape and confessed to being involved in the crime. *Id.* On appeal, the defendant argued that there was no evidence that after he invoked his right to counsel that he was again read his rights or waived them before giving his second oral statement. *Id.*

The Fort Worth court concluded that although the defendant reinitiated contact with officers after invoking his right to counsel, his second statement should not have been admitted because there was not strict compliance with article 38.22 section 3(a). *Id.* at 323. The interviewing officer did not advise the defendant of his

30

rights on videotape, stating to the defendant only that "you've just had your rights read." *Id.* That officer testified at the motion to suppress hearing that he did not read the defendant his rights before the second interview and that he was not at the magistrate's hearing so he did not know if the defendant had been advised of his rights there. *Id.*

*Hargrove* is distinguishable because the court was not presented with, and therefore did not consider, the issue of whether the two interviews were a continuation of each other such that the statutory rights did not have to be read a second time. Additionally, unlike the interviewing officer in *Hargrove*, Deputy Quintanilla here reminded Wharton of his rights, confirmed that Wharton recalled those rights and that he wanted to speak with law enforcement, and confirmed that Wharton had not been coerced or threatened into speaking with them again. We therefore reject Wharton's argument that *Hargrove* dictates the result in this case.

We acknowledge that *Bible* did not involve an invocation of counsel prior to the second interview session. However, we find *Bible* no less applicable under these circumstances. *Bradshaw* requires a "valid waiver of the right to counsel" that is "knowing and intelligent" based on "the totality of the circumstances." *Bradshaw*, 462 U.S. at 1046. As set forth above, the totality of the circumstances leads us to conclude that, after invoking his right to counsel, Wharton reinitiated conversation with law enforcement, confirmed that he understood his rights read to him less than

31

two hours before by the same interviewing deputy, and knowingly and intelligently waived his previously invoked right to counsel.[13]

Accordingly, the admission of Wharton's custodial statements was not prohibited by Code of Criminal Procedure article 38.22, and we hold that the trial court did not err in denying Wharton's motion to suppress his custodial statements on this basis.

### 4. Sixth Amendment Right to Counsel

Wharton likewise contends that the admission of his custodial statements violated his right to counsel under the Sixth Amendment. The Fifth and Sixth Amendments of the United States Constitution protect different interests. The Fifth Amendment provides a privilege against self-incrimination to a suspect who is in custody, and the privilege is triggered once that suspect has been given his *Miranda* warnings. *Pecina v. State*, 361 S.W.3d 68, 74–75 (Tex. Crim. App. 2012) (citing *Miranda*, 384 U.S. at 441). The Sixth Amendment right guarantees a defendant the right to counsel at all "critical" stages of a criminal proceeding. *Montejo v.*

---

[13]  *See Curl v. State*, No. 10-19-00174-CR, 2020 WL 6685878, at *3 (Tex. App.—Waco Nov. 12, 2020, pet. ref'd) (mem. op., not designated for publication) (holding admission of defendant's second recorded statement was not prohibited by federal law or article 38.22, even though defendant who had previously invoked right to counsel was not re-read his rights before second statement, because second statement was continuation of first, warnings were recorded during first statement, interviews were conducted by same officers and involved same offense, and officers reminded defendant of prior warnings and confirmed that defendant wished to waive right to counsel).

*Louisiana*, 556 U.S. 778, 786 (2009). "Critical stages include arraignments, postindictment interrogations, postindictment lineups, and the entry of a guilty plea." *Missouri v. Frye*, 566 U.S. 134, 140 (2012).

The Sixth Amendment right to counsel does not apply until it has attached, and it attaches when the prosecution has commenced. *Rubalcado v. State*, 424 S.W.3d 560, 570 (Tex. Crim. App. 2014). The prosecution commences for Sixth Amendment right-to-counsel purposes "at the first appearance before a judicial officer at which the defendant is told of the formal accusation against him and restrictions are imposed on his liberty." *Id.* (quoting *Rothgery v. Gillespie Cnty.*, 554 U.S. 191, 198 (2008)). "Generally, an Article 15.17 initial appearance and magistration[14] marks the initiation of adversarial judicial proceedings in Texas and

---

[14]  *See* TEX. CODE CRIM. PROC. art. 15.17(a) ("In each case enumerated in this Code, the person making the arrest or the person having custody of the person arrested shall without unnecessary delay, but not later than 48 hours after the person is arrested, take the person arrested or have him taken before some magistrate of the county where the accused was arrested . . . . The magistrate shall inform in clear language the person arrested, either in person or through a videoconference, of the accusation against him and of any affidavit filed therewith, of his right to retain counsel, of his right to remain silent, of his right to have an attorney present during any interview with peace officers or attorneys representing the state, of his right to terminate the interview at any time, and of his right to have an examining trial. The magistrate shall also inform the person arrested of the person's right to request the appointment of counsel if the person cannot afford counsel. The magistrate shall inform the person arrested of the procedures for requesting appointment of counsel.").

'plainly signals' the attachment of a defendant's Sixth Amendment right to counsel." *Pecina*, 361 S.W.3d at 77 (quoting *Rothgery*, 554 U.S. at 212).

Here, at the time Wharton invoked his right to counsel, he had been arrested pursuant to a pocket warrant. But no charges had been filed,[15] nor had he made an appearance before a judicial officer. Therefore, Wharton's Sixth Amendment right to counsel had not attached, and thus the admission of his custodial statements was not prohibited by the Sixth Amendment. We hold that the trial court did not err in denying Wharton's motion to suppress his custodial statements on this basis.

We overrule Wharton's third issue.

## C. Suppression of GPS Data

In his fourth issue, Wharton argues that the warrantless acquisition of the historical GPS data from a tracking device installed on his vehicle constituted an "unreasonable search" in violation of the Fourth Amendment to the United States Constitution and article I, section 9, of the Texas Constitution. Wharton contends that he had a reasonable expectation of privacy in the historical GPS data from his car dealership and, therefore, it was an unreasonable search and seizure to secure

---

[15] Deputy Quintanilla testified at the suppression hearing that, after Wharton invoked his right to counsel, he contacted the Harris County District Attorney's Office to let them know that Wharton "denied any knowledge and that he requested an attorney." The assistant district attorney told Quintanilla to "go ahead and file the capital murder [charge.]" Thereafter, Quintanilla began "doing all the proper booking paperwork and to file the charge."

this data without a warrant. He further contends that without the illegally obtained GPS data, the police lacked probable cause for Wharton's arrest. Therefore, Wharton asserts that the trial court erred in denying his motion to suppress the GPS data, as well as all other evidence obtained as a result of his arrest.

### 1.    Background

Before trial, Wharton moved to suppress the evidence obtained pursuant to his arrest, alleging that the probable cause for his arrest warrant was based on GPS evidence unlawfully acquired through a warrantless search.

The probable cause affidavit supporting the issuance of the arrest warrant relies, in part, upon information acquired from a GPS device installed on Wharton's vehicle. In the affidavit, Deputy Quintanilla attested that he:

> viewed video footage from a neighbor's security camera system and observed a black vehicle described as a black, 4-door, Ford Fusion with dark tinted windows casing the street. The video footage of the vehicle also contained an image of a front license plate that was bright yellow in color and displayed the logo of Coast to Coast Motors, a used car dealership with multiple locations within the greater Houston, Harris County area. The time stamp displayed on the video footage indicated the time of 1129 hours.

The surveillance video footage also showed this same vehicle pull into the Morales's driveway and depart approximately three minutes later.

Deputy Quintanilla contacted the manager at the Coast to Coast Motors dealership and learned that a black 2014 Ford Fusion was sold to Wharton on November 21, 2018. The manager also informed Deputy Quintanilla that each

vehicle sold with an outstanding lien was equipped with a GPS maintained by Goldstar GPS vehicle tracking. Coast to Coast and Goldstar provided Deputy Quintanilla the GPS data for Wharton's vehicle for the day of the murder—November 29, 2018.[16] That information showed that the vehicle was located within one quarter of a mile of Turner's residence at 9:59 a.m. on November 29, 2018, and that the vehicle was located within one quarter of a mile of the Morales's residence at 11:35 a.m.[17]

At the suppression hearing, the State introduced a "Motor Vehicle Retail Installment Sales Contract," listing Coast to Coast Motors, LLC as the seller and

---

[16]     At the suppression hearing, Deputy Crain testified that the police initially received the GPS data for a single day—November 29, 2018—the day of the murder. He agreed that "sometime later . . . an entire set of records was obtained by way of [a] grand jury subpoena." Deputy Quintanilla likewise testified that he initially received "one day of tracking," and at a later date, "grand jury subpoenaed" additional tracking records from November 22, 2018 to December 3, 2018. It is unclear from the record whether Deputy Quintanilla received the GPS tracking records for this longer period before testifying in the probable cause affidavit. He did testify at the suppression hearing that the only information included in the warrant with respect to the GPS location of the vehicle pertained to one day—the day of the murder.

[17]     Deputy Quintanilla stated that, although the GPS data received from Goldstar reflected that Wharton's vehicle was outside Turner's residence at 7:59 a.m. and outside the Morales's residence at 9:35 a.m., after contacting Goldstar, he discovered that Goldstar transmits the GPS data to their clients in Pacific Standard Time. Based on this information, Quintanilla attested that he believed Wharton's vehicle was at Turner's residence at 9:59 a.m., Central Daylight Time, and at the Morales's residence at 11:35 a.m., Central Daylight Time.

Wharton as the buyer of a 2014 Ford Fusion.[18]  The contract was signed by Wharton and dated November 21, 2018.  The State also introduced additional business records from Coast to Coast, including a "Buyer's Order" for the Ford Fusion listing the color of the vehicle as black; a "Customer Agreement"; and an "Addendum to Motor Vehicle Retail Sales Contract and Purchase Money Security Agreement."

In the Addendum signed by Wharton, Wharton agreed to allow Coast to Coast to install a "device into the vehicle that allows [it] to track the vehicle."  The Addendum included a clause that "the Device and all information that we [Coast to Coast] obtain from the device remains our sole property."

Additionally, the Customer Agreement signed by Wharton contains a "GPS Access Consent and Authorization Clause" that states:

> I hereby consent and authorize PrimaLend[19] to have access to all GPS tracking data and information on any other payment protection device that may be installed on the motor vehicle purchase by me under the Sales or Lease Contract from Dealer.  I hereby waive any and all rights of privacy related to information obtained by PrimaLend related to such Sales or Lease Contract[.]

### 2.    Analysis

The Fourth Amendment protects against "unreasonable searches and seizures" by government officials. U.S. CONST. amend. IV; *see also* TEX. CONST.

---

[18]    Wharton's common-law wife, Mariesha Alexander, was listed as the co-buyer.

[19]    PrimaLend is listed as the lender for Coast to Coast Motors.

art. I, § 9.[20]  The United States Supreme Court uses two approaches to determine whether a search has occurred.  The first is "'tied to common-law trespass' and focuse[s] on whether the Government 'obtains information by physically intruding on a constitutionally protected area.'" *Carpenter v. United States*, 585 U.S. 296, 304 (2018) (quoting *United States v. Jones*, 565 U.S. 400, 405 (2012)).  The second recognizes that "the Fourth Amendment protects people, not places," and therefore, focuses on whether the government violates a person's reasonable expectation of privacy. *Id.* (quoting *Katz v. United States*, 389 U.S. 347, 351 (1967)).

To claim *Katz* protection under the privacy-based approach, an individual must have sought to preserve the information in question as private. *See id.*  The conduct must exhibit an actual, subjective expectation of privacy and that subjective expectation is one which society recognizes as objectively reasonable. *See id.*; *see also Smith v. Maryland*, 442 U.S. 735, 740 (1979).  Where these two requirements are met, "official intrusion into that private sphere generally qualifies as a search and requires a warrant supported by probable cause." *Carpenter*, 585 U.S. at 304 (citing *Smith*, 442 U.S. at 740).

---

[20]  Generally, absent some significant difference between the text of the two provisions, the court of criminal appeals will not read article I, section 9 of the Texas Constitution differently than the Fourth Amendment in a particular context simply because it can. *See Holder v. State*, 595 S.W.3d 691, 701–02 (Tex. Crim. App. 2020).

Generally, information that a person "knowingly exposes to the public . . . is not a subject of Fourth Amendment protection." *United States v. Miller*, 425 U.S. 435, 442 (1976) (quoting *Katz*, 389 U.S. at 351). Therefore, if an individual has conveyed information to a third party or to the public at large, "even if the information is revealed on the assumption that it will be used only for a limited purpose," the government will generally not be required to obtain a warrant before obtaining the information. *Id.* at 443. But "[a] person does not surrender all Fourth Amendment protection by venturing into the public sphere," and "the fact of diminished privacy interests does not mean that the Fourth Amendment falls out of the picture entirely." *Carpenter*, 585 U.S. at 310, 314 (internal quotations omitted). As emphasized in *Carpenter*, "the nature of the particular documents sought" must be considered in determining whether "there is a legitimate expectation of privacy concerning their contents." *Id.* at 314 (quoting *Miller*, 425 U.S. at 442).

Wharton invokes the *Katz* privacy-based approach, citing primarily to the Supreme Court's opinions in *Jones* and *Carpenter* and *United States v. Diggs*,[21] a Northern District of Illinois case applying these decisions to GPS data, arguing that he had a reasonable expectation of privacy in his movements as chronicled in the

---

[21]   *See United States v. Diggs*, 385 F. Supp. 3d 648, 650–55 (N.D. Ill. 2019) (holding government's warrantless acquisition of historical GPS data from vehicle driven by defendant was a search, even though defendant's girlfriend, who was owner of vehicle, had signed contract allowing third party to use tracking device to locate vehicle).

GPS tracking data of his vehicle. We find these decisions distinguishable and, for the reasons set forth below, conclude that Wharton did not have a reasonable expectation of privacy in this data based on the specific facts in this case.

In *Carpenter*, the government compelled production of cell-site location information ("CSLI") from a wireless carrier without a warrant and the Supreme Court was faced with the question of "whether the Government conducts a search under the Fourth Amendment when it accesses historical cell phone records that provide a comprehensive chronicle of the user's past movements." *Id.* at 300, 302. In considering this question, the Supreme Court acknowledged that the answer to the question "lie[s] at the intersection of two lines of cases." *Id.* at 306. The first set of cases addresses a person's expectation of privacy in his physical location and movements, and the second addresses a person's expectation of privacy in information voluntarily turned over to third parties. *Id.* at 306–08.

For instance, in *Knotts*, the Supreme Court considered the Government's use of a beeper, planted by police officers in a container before it was purchased by Knotts's co-conspirator, to track and follow a vehicle through traffic. *United States v. Knotts*, 460 U.S. 276, 278–79 (1983). The Supreme Court concluded that this governmental surveillance did not constitute a search because "[a] person travelling in an automobile on public thoroughfares has no reasonable expectation of privacy in his movements from one place to another." *Id.* at 281. Since the movements of

40

the vehicle and its final destination has been "voluntarily conveyed to anyone who wanted to look," the Court held that Knotts could not assert a privacy interest in the information obtained. *Id.*

More recently, in *Jones*, the Supreme Court considered whether a search occurred when the government attached a GPS tracking device to a suspect's vehicle and used it to monitor the vehicle's movements over a 28-day period. *Jones*, 565 U.S. at 403–04. The Supreme Court unanimously held that a search occurred but split as to why. The five-Justice majority held that the government conducted a search by "physically occup[ying] private property for the purpose of obtaining information." *Id.* at 404–05.

At the same time, five Justices agreed that related privacy concerns would be raised by, for example, "surreptitiously activating a stolen vehicle detection system" in Jones's car to track Jones himself or conducting GPS tracking of his cell phone. *Id.* at 426, 428 (Alito, J., concurring in judgment); *id.* at 415 (Sotomayor, J., concurring). Since GPS monitoring of a vehicle tracks "every movement" a person makes in that vehicle, the concurring Justices concluded that "longer term GPS monitoring in investigations of most offenses impinges on expectations of privacy"—regardless of whether those movements were disclosed to the public at large. *Id.* at 430 (Alito, J., concurring in judgment); *id.* at 415 (Sotomayor, J., concurring). Thus, although *Jones* was formally resolved under the trespass-based

approach, "[a] majority of [the] Court . . . recognized that individuals have a reasonable expectation of privacy in the whole of their physical movements." *Carpenter*, 585 U.S. at 310 (citing *Jones*, 565 U.S. at 430 (Alito, J., concurring in judgment); *id.* at 415 (Sotomayor, J., concurring)).

The second line of cases involves the third-party doctrine. It has its genesis in the Supreme Court's decisions in *Miller* and *Smith*. In *Miller*, the Court rejected a Fourth Amendment challenge to the Government's warrantless collection of bank records, which included canceled checks and bank statements. *Miller*, 425 U.S. at 438–40. The Court noted first that the documents subpoenaed were not "private papers," but instead the "business records of the banks," in which Miller could "assert neither ownership nor possession." *Id.* at 440. The Court then held that Miller had no "legitimate expectation of privacy" in the documents' contents because "[t]he checks are not confidential communications but negotiable instruments to be used in commercial transactions," and because all of the documents "contain only information voluntarily conveyed to the banks and exposed to their employees in the ordinary course of business." *Id.* at 442. The Court explained:

> The depositor takes the risk, in revealing his affairs to another, that the information will be conveyed by that person to the Government. . . . This Court has held repeatedly that the Fourth Amendment does not prohibit the obtaining of information revealed to a third party and conveyed by him to Government authorities, even if the information is revealed on the assumption that it will be used only for a limited purpose and the confidence placed in the third party will not be betrayed.

*Id.* at 443 (internal citations omitted).

In *Smith*, the Supreme Court similarly held that the Government's use of a pen register—a device that recorded the outgoing phone numbers dialed on a landline telephone—was not a search. *Smith*, 442 U.S at 736 n.1, 742. The Court "doubt[ed] that people in general entertain any actual expectation of privacy in the numbers they dial." *Id.* at 742. "Telephone users . . . typically know they must convey numerical information to the phone company; that the phone company has facilities for recording this information; and that the phone company does in fact record this information for a variety of legitimate business purposes." *Id.* at 743. The Court went on to conclude that an expectation of privacy in such information is not "one that society is prepared to recognize as reasonable," because Smith "voluntarily conveyed numerical information to the telephone company and 'exposed' that information to its equipment in the ordinary course of business." *Id.* at 743–44. In doing so, the Court held that Smith "assumed the risk that the company would reveal to police the numbers he dialed." *Id.* at 744.

Recognizing that the digital data collected by cell phones, i.e., "personal location information maintained by a third party," did not fit neatly under these existing precedents, the Supreme Court in *Carpenter* confronted "how to apply the Fourth Amendment to a new phenomenon: the ability to chronicle a person's past

movements through the record of his cell phone signals." *Carpenter*, 585 U.S. at 306, 309.

Although the Court kept intact the precedent that a person holds no legitimate privacy interest in the information he voluntarily turns over to third parties, "even if the information is revealed on the assumption that it will be used only for a limited purpose," the Court declined to extend these concepts to cover CSLI:

> Given the unique nature of cell phone location records, the fact that the information is held by a third party does not by itself overcome the user's claim to Fourth Amendment protection. Whether the government employs its own surveillance technology as in *Jones* or leverages the technology of a wireless carrier, we hold that an individual maintains a legitimate expectation of privacy in the record of his physical movements as captured through CSLI.

*Id.* at 308–10.[22]

The Supreme Court noted that CSLI "present[s] even greater privacy concerns than the GPS monitoring of a vehicle . . . considered in *Jones*," because a cell phone is "almost a 'feature of human anatomy'" that "tracks nearly exactly the movements of its owner." *Id.* at 311 (quoting *Riley v. California*, 573 U.S. 373, 385 (2014)). "[W]hen the government tracks the location of a cell phone it achieves near perfect surveillance, as if it had attached an ankle monitor to the phone's user." *Id.* at 311-12.

---

[22]     The Texas Court of Criminal Appeals, adopting the reasoning in *Carpenter*, has likewise held that "the third-party doctrine alone cannot defeat a person's expectation of privacy in at least 23 days of historical CSLI under Article I, Section 9." *Holder*, 595 S.W.3d at 703.

Because individuals "compulsively carry cell phones with them all the time[,] [a] cell phone faithfully follows its owner beyond public thoroughfares and into private residences, doctor's offices, political headquarters, and other potentially revealing locales." *Id.* at 311.

As explained in *Carpenter*, the harm inherent in a government's warrantless gathering of CSLI stems primarily from the holder's virtual attachment to the cell phone device—allowing for an "all-encompassing record of the holder's whereabouts" that provides "an intimate window into a person's life, revealing not only his particular movements, but through them his 'familiar, political, professional, religious, and sexual associations.'" *Id.* at 311 (quoting *Jones*, 565 U.S. at 415 (Sotomayor, J., concurring)).

One Florida court has held that, under similar circumstances, GPS data like that at issue here is not comparable to CSLI because, unlike "[t]he privacy-penetrating capacity of cell phones," cars have "'little capacity for escaping public scrutiny' as they largely only travel through public thoroughfares." *See Bailey v. State*, 311 So.3d 303, 314 (Fl. Dist. Ct. App. 2020) (citing *Carpenter*, 585 U.S. at 311). And, as acknowledged in *Carpenter*, "individuals regularly leave their vehicles." 585 U.S. at 311.

Moreover, a vehicle is frequently operated and driven by others, as Wharton's was here,[23] and thus must be distinguished from a cell phone which is treated as "almost a 'feature of human anatomy.'" *Bailey*, 311 So.3d at 314 (citing *Carpenter*, 585 U.S. at 311). "Because cars do not bear the same attachment to their owners and cannot penetrate private spaces to the same degree, government acquisition of a vehicle's GPS data does not give rise to the same risk of all-encompassing surveillance as CSLI." *Id.*

Critically, allowing the collection of GPS data without a warrant in this context would be limited to only those car owners who have affirmatively consented to the collection and sharing of such tracking information. This is in stark contrast to the collection of CSLI, which "is not truly 'shared' as one normally understands the term." *Carpenter*, 585 U.S. at 315. Rather, CSLI is generated by virtually any activity on the cell phone and "without any affirmative act on the part of the user beyond powering up." *Id.*

Furthermore, because CSLI "is continually logged for all of the 400 million devices in the United States—not just belonging to persons who might happen to come under investigation—this newfound tracking capacity runs against everyone." *Id.* at 312. As the Court explained:

---

[23] Wharton stated during his custodial interview that although he "sometimes" drives, his wife is the one who normally drives the vehicle.

46

> Whoever the suspect turns out to be, he has effectively been tailed every moment of every day of five years, and the police may—in the Government's view—call upon the results of that surveillance without regard to the constraints of the Fourth Amendment. *Only the few without cell phones could escape this tireless and absolute surveillance*.

*Id.* (emphasis added). The same cannot be said of GPS tracking devices installed on vehicles with the consent of their owners.

Lastly, we agree with our sister court in Fort Worth that, at the most basic level, there remains a fundamental difference between CSLI from a cell phone and information obtained from a vehicle GPS-tracking device. *See LopezGamez v. State*, 622 S.W.3d 445, 455 (Tex. App.—Fort Worth 2020, pet. ref'd). Although the primary purpose of a cell phone is to communicate, cell phone technology also allows for the tracking of the user's location and movements. *Id.* In contrast, "the essential purpose of a GPS device is to track a person's movements. When a person permits a GPS device to be installed on a vehicle, that person has an affirmative expectation that his or her movements and locations will be tracked." *Id.* In light of this fundamental difference, the Fort Worth Court of Appeals declined to extend *Carpenter* and *Jones* to the retrieval of real-time GPS location information—particularly where the appellant had agreed, as a condition of the purchase of his vehicle, to allow the dealership access to the vehicle's location via a real-time GPS tracking device. *Id.* at 454–55.

With these principals in mind, we note that the holding in *Carpenter* is decidedly narrow and limited to the warrantless collection of CSLI. The Court in *Carpenter* explicitly stated that it was not addressing other business records that might incidentally reveal location information.[24] Although Wharton urges this Court to follow the Northern District of Illinois decision in *Diggs* in extending *Carpenter* and *Jones* beyond CSLI to historical GPS data, we decline to do so. Instead, for all the reasons detailed above, we conclude that the GPS data here is qualitatively different than the "tireless and absolute surveillance" afforded through collection of CSLI. *See Carpenter*, 585 U.S. at 312. And we therefore reject Wharton's argument that *Carpenter* and *Jones* compel suppression here.

Rather, the record here demonstrates that, as a condition of the purchase of the vehicle, Wharton affirmatively consented to and authorized Coast to Coast to access his vehicle's GPS tracking data and waived all rights to privacy in such information. Although we recognize that the third-party doctrine does not automatically attach to all information transmitted to a third party, based on the fundamental differences between CSLI and the GPS tracking data at issue here, we conclude that when Wharton voluntarily turned over his vehicle's location

---

[24]  *See Carpenter v. United States*, 585 U.S. 296, 316 (2018) ("Our decision today is a narrow one. We do not express a view on matters not before us . . . . We do not disturb the application of *Smith* or *Miller* or call into question conventional surveillance techniques and tools . . . . Nor do we address other business records that might incidentally reveal location information.").

48

information to a third party, and then voluntarily traveled in that vehicle on public roads, he relinquished his expectation of privacy in that information. *See Smith*, 442 U.S. at 743–44; *Miller*, 425 U.S. at 442–43; *Knotts*, 460 U.S. at 278–81. Thus, we conclude that no unreasonable search occurred here in violation of either the Fourth Amendment or article 1, section 9, when the police obtained that GPS tracking data without a warrant. *See, e.g.*, *LopezGamez*, 22 S.W.3d at 453–55; *Bailey*, 311 So.3d at 314–16.

We therefore hold that the trial court did not err by denying Wharton's motion to suppress the GPS data. And because there was no unlawful search, we further hold that the trial court did not err by denying Wharton's motion to suppress the other evidence obtained as a result of his arrest.

We overrule Wharton's fourth and fifth issues.

### Admission of Hearsay Evidence

In his sixth issue, Wharton argues that the trial court erred in admitting hearsay evidence connecting Wharton to a cell phone number found on Turner's phone. Specifically, Wharton objects to the following exchange that occurred during Deputy Crain's direct examination.

> [State]: I want to show you what's been previously admitted as State's Exhibit 174, and this is an excerpt from a conversation found on Bobby Turner's phone. Would you tell us what we're looking at here?

49

[Crain]: That is a[n] ingoing/outgoing message thread between Bobby Turner's phone and another phone.

[State]: Does that other phone -- well, would you tell us that other phone's number and the name or tag associated with it?

[Crain]: [xxx]-[xxx]-8397, and it was listed in Bobby Turner's phone, the contact identifier was Lil Wayne.

[State]: And did you ultimately have a chance to associate that number with a person?

[Crain]: We did.

[State]: And what name did you get from that number?

[Defense]: Judge, we'd object based on our previous objections raised to this and object to it as hearsay as well.

Court: And I'll allow it. You may proceed.

[Defense]: I'm sorry, Judge. I couldn't understand what you said.

Court: I said, I'll allow, overruled.

[Defense]: Overrule, thank you.

[Crain]: We connected that number to Dwayne Wharton.

Wharton contends that Deputy Crain's testimony identifying Wharton as the owner of the cell phone number ending in 8397, and thus the person communicating with Turner on the morning of the murder, was hearsay. Thus, according to Wharton, the trial court erred in admitting it when no other evidence was introduced

at trial of business records, or other authentication, to identify the owner of the phone.[25]

We review a trial court's evidentiary ruling for abuse of discretion. *Hammons v. State*, 239 S.W.3d 798, 806 (Tex. Crim. App. 2007). As long as the trial court's ruling is within the zone of reasonable disagreement, we will not intercede. *Lopez v. State*, 86 S.W.3d 228, 230 (Tex. Crim. App. 2002). As a general rule, an out-of-court statement offered for the purpose of proving the truth of the statement is inadmissible hearsay. TEX. R. EVID. 801(d), 802.

Assuming without deciding that the trial court erred in overruling Wharton's objection, the admission of the complained-of hearsay testimony was harmless error. The admission of a hearsay statement is non-constitutional error; it entitles the defendant to reversal only if it affects the defendant's substantial rights. TEX. R. APP. P. 44.2(b); *Coleman v. State*, 428 S.W.3d 151, 162 (Tex. App.—Houston [1st Dist.] 2014, pet. ref'd). A defendant's substantial rights are affected if the hearsay's admission has "a substantial or injurious effect in determining the verdict." *Coleman*, 428 S.W.3d at 162. "We do not overturn a conviction if, after examining

---

[25] To the extent that Wharton is raising a separate argument that the cell phone number was not properly authenticated, we conclude that this objection was not raised in the trial court. As a result, it is not properly before us to consider. *See* TEX. R. APP. P. 33.1(a).

the record as a whole, we have fair assurance that the error did not influence the verdict or had but a slight effect." *Id.*

Improper admission of evidence is not reversible error if the same or similar evidence is admitted without objection at another point in the trial. *Leday v. State*, 983 S.W.2d 713, 718 (Tex. Crim. App. 1998); *see Lamerand v. State*, 540 S.W.3d 252, 256–57 (Tex. App.—Houston [1st Dist.] 2018, pet. ref'd) ("The erroneous admission of hearsay does not constitute reversible error if other evidence proving the same fact is properly admitted elsewhere." (quotation and citation omitted)). In other words, when the erroneous admission of evidence is cumulative of other properly admitted evidence proving the same fact, the erroneous admission is considered harmless. *See Brooks v. State*, 990 S.W.2d 278, 287 (Tex. Crim. App. 1999); *see also Burks v. State*, 876 S.W.2d 877, 898 (Tex. Crim. App. 1994).

Here, any error in admitting Deputy Crain's testimony identifying Wharton as the owner of the cell phone number ending in 8397 was harmless because the same evidence was properly admitted through Wharton's own recorded statement that was introduced as State's Exhibit 171. In that statement, Deputy Quintanilla asked Wharton was if he has a phone number, to which Wharton responded yes and provided the same number Deputy Crain identified as belonging to Wharton. By Wharton's own admission, he provided the same facts as Deputy Crain's testimony and therefore we conclude that, to the extent the complained-of testimony was

52

erroneously admitted, it was harmless. *See* TEX. R. APP. P. 44.2(b); *Burks*, 876 S.W.2d at 898.

We overrule Wharton's sixth issue.

## Conclusion

We affirm the trial court's judgment in all things. We dismiss any pending motions as moot.

Terry Adams
Chief Justice

Panel consists of Chief Justice Adams and Justices Hightower and Countiss.

Publish. TEX. R. APP. P. 47.2(b).